**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TP GROUP-CI, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. <u>1:16-cv-7463</u> |
| | ) | |
| STEVEN R. SMITH AND | ) | |
| WILLIAM DEAN WALLACE, | ) | |
| Defendants. | ) | |

<u>**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**</u>

NOW COMES Plaintiff TP Group-CI, Inc. ("TP Group" or "Plaintiff"), by and through its attorneys, Winston & Strawn LLP, and for its Complaint against Steven R. Smith ("Smith") and William Dean Wallace ("Wallace," and collectively, the "Defendants"), states as follows:

<u>**INTRODUCTION**</u>

1.      Through this breach of contract action, Plaintiff seeks injunctive relief and money damages from two former employees and owners of Plaintiff's medical device business, Clinical Innovations ("CI").   In blatant disregard of their contractual obligations—including their obligations not to compete, not to solicit, not to usurp, and to maintain confidentiality—Defendants Smith and Wallace brazenly, secretly, and unlawfully stole CI's inventions and know-how.  Defendants did this themselves and through an inside man whom they paid tens of thousands of dollars under the table.  With the aid of that which they stole, and in direct competition with CI, Defendants are preparing to manufacture and sell variations of CI's highly valuable catheter products and have begun marketing their catheter manufacturing capabilities.

2.      A recent investigation conducted by TP Group has uncovered abundant evidence of such wrongdoing, including documents, emails, and witness testimony that demonstrates the depths of Defendants' subversion.  For example, via email, and while still employed by CI,

Wallace sent to Smith (who was no longer a CI employee) highly confidential and proprietary information relating to diagnostic catheter products and important business relationships. Smith and Wallace then utilized such information to compete with CI on multiple fronts, including by launching a competing enterprise and soliciting business from one of CI's most significant customers.

3.     Further, Smith covertly paid tens of thousands of dollars to another employee of Plaintiff's company, a long-time engineer named Ivan Vetecnik ("Vetecnik"), to corruptly serve as another inside man.[1]  Among other things, Vetecnik leaked to Smith confidential information concerning CI's products, processes, and manufacturing machines.  Vetecnik also used CI's facilities and equipment (often at night and on weekends), as well as company techniques and know-how, to build for Smith several machines used by Smith to offer manufacturing services that compete with CI, all while working fulltime for CI.  Vetecnik's emails,[2] most of which were sent within the restricted period described in more detail herein, leave no doubt as to Defendants' scheme.  For example:

> a.  ***We are founding [a company] together with one of the former owners of this company [i.e., Smith]*** who, after they sold this one, received about 20 million and had to sign that he would not be doing any business in this field for five years. First year is over in a flash and he wants to start doing pretty must [sic] the same, but a bit improved.  However, he needs me to do that because I . . . invented all these production lines here and I make them with 'these hands.'  ***So we have to***

---

[1]     TP Group has filed a separate action against Vetecnik in the United States District Court for the District of Delaware—the venue called for in Vetecnik's stock option agreement.

[2]     All of the emails quoted in this Complaint that were sent by Vetecnik were recovered from Vetecnik's CI email account.  Some of those emails were written in the Czech language. Such emails, as set forth herein, have been translated into English by a certified translator.

*meet secretly because the five year period will [be] over only in January.* But until then, he is buying from me the equipment for his production so that he can start immediately." (July 13, 2014 email (emphases added).) (Attached hereto as Exhibit A.)

b. "I have a bit of a moral dilemma because three clever friends, a doctor, an engineer, and a computer science engineer, hired me here. . . . And this man is slowly starting a similar company. He wants me to become his partner. *So far I am only making a production line for him here* **under the table** *so that he could start right away.* It is approximately ten devices of different complexity that I am making and selling to him. 5 thousand a piece on average. It is my main priority now because I will pay off some cards and half of the house with it." (Aug. 1, 2014 email (emphasis added).) (Attached hereto as Exhibit B.)

c. "***I'll work with [Smith] under the table,*** but that could result in a serious conflict of interest since ***one of his products will be very similar to the product we produce here***." (Nov. 19, 2014 email (emphases added).) (Attached hereto as Exhibit C.)

d. "For almost a year, I've been ***preparing in secret a new company***, which will basically be a ***direct competitor to our firm***." (Dec. 19, 2015 email (emphases added).) (Attached hereto as Exhibit D.)

4. Plaintiff, among other things, now seeks an injunction to stop Defendants' still-unfolding scheme and to avoid continuing irreparable harm to Plaintiff and CI.

## NATURE OF ACTION

5.      Defendants Smith and Wallace are two of the three founders of CI, one of the largest manufacturers of, among other medical devices, diagnostic catheters.  In 2010, Smith and Wallace (along with other stockholders) sold CI to Plaintiff TP Group for a substantial sum, with Smith and Wallace each personally receiving significant payouts.

6.      As part of the sale, Smith and Wallace entered into a series of agreements with TP Group (as CI's sole owner), pursuant to which Smith and Wallace—as key executives of CI with extensive experience with and know-how of CI's products and the catheter industry, and the recruiters of many of CI's key employees—agreed not to compete with CI, interfere with any entity CI does business with, or solicit employees from CI for a period of five years from the closing of the transaction.  This five-year time period is customary for transactions of a similar nature and is sometimes referred to herein as the "restrictive period."  They also agreed to maintain the confidentiality of Plaintiff's and CI's proprietary information and trade secrets.

7.      Smith and Wallace did not keep their promises to TP Group.  Instead, over the course of the past several years, and continuing to the present, Smith and Wallace repeatedly disregarded such promises both together and independently.  For example, and as described more fully herein:

    a.  After leaving employment with CI in 2011, and during the continuation of the restricted period, upon information and belief, Smith founded and/or affiliated himself with various companies for the purpose of developing catheter products (as well as associated manufacturing techniques and facilities) that compete with those developed, owned, and/or manufactured by CI.  Among other things, Smith has been and currently is working on development of

4

modified versions of CI's most popular catheters. These devices seek to improve upon CI's versions and/or could be manufactured (and, thus, sold) at a significantly lower price than CI's versions. They would not only compete with CI, but would also directly harm its business. Further, Smith has solicited business from one of CI's primary business partners, potentially resulting in the loss of catheter manufacturing business for CI. In addition, Smith also wrongfully and unlawfully solicited several CI employees to assist him with this venture, including a number that quit CI and immediately thereafter joined Smith's newly formed venture.

b. Smith's competition with CI was aided by Wallace, who remained an employee of CI after Smith departed.[3] Documentary evidence uncovered by Plaintiff in an internal investigation into Defendants' actions includes several emails sent by Wallace to Smith that contained confidential and proprietary information concerning CI's catheter products, manufacturing processes, and business opportunities. Smith utilized such information to further the goal of usurping business from CI. Wallace himself—while still drawing a paycheck from CI—also founded and/or became affiliated with companies that, upon information and belief, engage in business that competes with CI, including by collaborating with and assisting one or more of the companies founded by or affiliated with Smith.

8.     Smith also utilized the assistance of Vetecnik, who joined CI a few years after Smith and Wallace founded the company. Smith paid Vetecnik thousands of dollars to engage in

---

[3]     Wallace was terminated from employment by CI on July 22, 2016.

5

corporate espionage from within CI. In this role, Vetecnik secretly leaked confidential CI information to Smith and also used CI resources and equipment, as well as techniques and methods developed by Vetecnik or others at CI, to secretly build catheter-manufacturing machines[4] that, upon information and belief, were utilized by Smith in developing catheter products and manufacturing capabilities intended to compete with CI. These techniques, methods, and manufacturing processes are critical to CI's position in the marketplace.

9. The secret arrangement between Smith and Vetecnik only recently came to light, when a CI employee noticed, on Vetecnik's desk at CI, drawings and other confidential information relating to catheter products that were outside the scope of Vetecnik's engineering duties. Vetecnik was quickly terminated. Thereafter, Plaintiff commenced its investigation into the depth of Vetecnik's misconduct, ultimately revealing the multiple, egregious (and ongoing) contractual breaches by Defendants Smith and Wallace.

10. As described further in this Complaint, Plaintiff has been harmed by Defendants' breaches and stands to suffer irreparable harm should Defendants be permitted to continue engaging in the conduct alleged herein. Most particularly, Plaintiff fears Defendants' introduction of the modified versions of CI's catheter products into the market (or their sale to another competitor), as such action would fundamentally undercut CI's business. Plaintiff also fears Defendants are utilizing and/or will be utilizing the machines that Vetecnik secretly built along with confidential CI information to establish manufacturing capabilities for such catheter products, as well as others, and thereby compete with CI's manufacturing business. Plaintiff thus seeks, among other remedies, injunctive relief to prevent Defendants from taking such steps.

---

[4] In the production of catheters, there are certain devices that are referred to as "fixtures" that help with particular assembly steps, as well as machines that complete certain processes. For ease, throughout the Complaint, both such devices will be referred to herein as "machines."

## PARTIES AND RELEVANT NON-PARTIES

11.     Plaintiff TP Group-CI, Inc. is a corporation organized under the laws of the state of Delaware, with a principal place of business located at 111 S. Wacker Dr., Chicago, Illinois.

12.     Clinical Innovations, LLC is a relevant non-party and a limited liability company with one member, TP Group, which owns all of CI's assets (including intellectual property, trade secrets, and confidential information).  CI's principal place of business is located at 747 W. 4170 S., Murray, Utah.  CI is a large woman's healthcare product manufacturer that focuses on labor and delivery.  CI's products are sold throughout the United States and in 72 other countries.

13.     On information and belief, Defendant Steven R. Smith is a citizen of the state of Utah, and he is domiciled at 14062 S. Mule Deer Drive, Draper, UT 84020.

14.     On information and belief, Defendant William Dean Wallace is a citizen of the state of Utah, and he is domiciled at 1316 East Utah Highlands Drive, Lehi, Utah 84043.

15.     On information and belief, Ivan Vetecnik is a relevant non-party and a citizen of the state of Utah, who is domiciled at 845 West Rockhill Circle, Salt Lake City, Utah, 84123.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

17.     This Court has personal jurisdiction over Defendant Smith under Section 20(j) of the Stockholder Agreement (as defined below), in which Smith irrevocably submitted to the exclusive jurisdiction of this Court over any dispute arising out of or relating to the Agreement.

18.     This Court has personal jurisdiction over Defendant Wallace under Section 20(j) of the Stockholder Agreement (as defined below) and Section 8(q) of the Executive Stock

Purchase Agreement (as defined below), in which Wallace irrevocably submitted to the exclusive jurisdiction of this Court over any dispute arising out of or relating to the Agreements.

19.     Venue is appropriate in this judicial district because the Northern District of Illinois has exclusive jurisdiction over Plaintiff's claims and, in the same provisions cited in the above paragraphs, each Defendant irrevocably and unconditionally waived any objection that this Court is an inconvenient forum for an action arising out of their agreements with Plaintiff.

## FACTUAL BACKGROUND

### Clinical Innovations' Business

20.     In the early 2000s, Smith and Wallace, together with another individual, founded CI, a company that develops, manufactures, and markets woman's healthcare medical devices, including for use in labor and delivery, including, among other things, diagnostic catheter products.

21.     Among the catheters manufactured and marketed by CI are Koala and TDOC. Koala is an intrauterine catheter that measures pressure during childbirth.  TDOC is a diagnostic catheter with urinary, gastroenterological, and other applications.

22.     Both TDOC and Koala essentially serve as pressure sensors in whatever part of the body they are inserted.  More specifically, both products are comprised of cylinders of air that connect via tubing to a balloon on one end and on the other end to an electronic reusable cable (via a connector) that attaches to a monitor.  When the connector is plugged into the reusable cable, it provides an air charge to the system that partially inflates the balloon.  Pressure changes within the body then cause the air column pressure to change and the connected transducer in the cable turns the pressure differences into an electronic signal that is read by the monitor.  The tubing used for TDOC contains multiple different channels (akin to tubes within

the tubing) that are referred to as "lumens." The Koala product has different tubes within the tubing, but these different channels are still referred to as "lumens."

23. The process of manufacturing TDOC and Koala requires the construction, maintenance, modification, and use of several different manufacturing machines, many of which incorporate specialized techniques developed by CI. The machines CI utilizes include, among others, a splitter (a machine used by CI to manufacture TDOC, and specifically, to split TDOC's multiple lumen tubes) and balloon-blowing machines (used to create and mold the balloons attached to the catheters).

24. The process of manufacturing TDOC and Koala also involves a substantial amount of "art" that depends, in great deal, on the experience and technical know-how of CI's engineers, who have spent significant time and resources determining the design, arrangement, and functionality of the various machines involved in, and the techniques and methods incorporated into, the intricate manufacturing process.

25. Upon information and belief, many of the particular processes utilized by CI to manufacture TDOC and Koala, and to design, construct, modify, and/or maintain many of the machines used during the manufacturing of TDOC and Koala, are not commonly known in the industry, and have been specifically designed by CI to provide CI with a competitive advantage over other manufacturers of diagnostic catheters. Further, the patent for the Koala technology is expiring in September 2016, thus making CI's manufacturing competitive advantage even more important to the future health of CI.

26. In recognition of the proprietary value inherent to its products and manufacturing processes, CI employs a variety of measures to safeguard that value. Among other things, CI has long used a security system that requires employees to swipe either an access card or fob in order

to control access into and out of its facilities, including requiring such a swipe to enter the clean room (where the most sensitive manufacturing processes are performed) from the warehouse. Additionally, all employees have unique user identifications and passwords that must be entered to access CI computers.

27. Further, as described in detail below, employees are required to enter into confidentiality agreements with the company, pursuant to which disclosure or use of CI's confidential information is prohibited. And, higher-level employees, who are more likely to possess valuable technical know-how and experience, are required to enter into non-competition and non-solicitation agreements with the company to protect the siphoning of critical proprietary information from CI to competitors. CI also maintains an Employee Handbook that sets forth additional procedures and requirements concerning the protection of confidential and proprietary information that employees are obligated to follow.

### Defendants' Roles With Clinical Innovations

28. From the founding of CI until he left employment on or about September 2, 2011, Defendant Smith held various executive positions with CI. At the time he left employment with CI, Smith was the head of engineering, which included product development.

29. From the founding of CI through July 22, 2016, Defendant Wallace held various executive positions with CI, including Vice President of Research and Development. Wallace's most-recent position was a part-time role in research and development. As a result of the wrongdoing set forth herein, Wallace was terminated from employment by CI on July 22, 2016.

30. From the early 2000s until his termination on June 14, 2016, Ivan Vetecnik was employed by CI as a full-time engineer, primarily responsible for identifying and repairing problems that arose in the company's manufacturing lines.

31. Upon information and belief, prior to joining CI, Vetecnik had worked with Smith at another medical device company, and Smith recruited Vetecnik to join CI sometime after its founding.

32. After a reorganization of departments in 2015, Vetecnik was assigned to be a "sustaining engineer" with responsibility for, among other things, keeping certain product lines operating during the manufacturing process.

**TP Group Acquired Clinical Innovations And Entered Agreements With Defendants**

33. As described further below, in late 2010, TP Group acquired all of the shares to CI. Upon information and belief, as consideration for the sale of CI to TP Group, both Wallace and Smith received substantial sums. Prior to that, upon information and belief, both Defendants also received tens of millions of dollars when selling off their primary founding-interests in CI to the owner that preceded Plaintiff.

34. In conjunction with the acquisition of CI, TP Group entered at least three separate agreements with Smith and Wallace in their capacity as (1) sellers of CI (a Stock Purchase Agreement), (2) continuing "rollover" owners of CI (an Executive Stock Purchase Agreement), and (3) as employee stockholders of the newly acquired company (a Stockholders Agreement). All three agreements are governed by Delaware law.

35. Pursuant to the Stock Purchase Agreement, dated December 10, 2010 (the "Stock Purchase Agreement") (attached hereto as Exhibit E), TP Group acquired all of the shares of CI. Smith and Wallace, as sellers of CI, each were parties to the Stock Purchase Agreement, which, as set forth below, contained non-competition and non-solicitation provisions binding Smith and Wallace. As set forth further below, promises to maintain confidentiality and not to usurp

corporate opportunities also were made by Smith and Wallace in the Stockholders Agreement and Executive Stock Purchase Agreement, respectively.

*Non-Competition Agreement*

36.      In recognition of the significant roles held by Smith and Wallace as executives and founders of CI and the highly sensitive information about its business and products they held, both Smith and Wallace were categorized as "Restricted Sellers" under the Stock Purchase Agreement.  As such, among other things, both Smith and Wallace agreed not to compete, directly or indirectly, with CI for five years after closing in Section 7.1(a) of the Stock Purchase Agreement.

37.      More specifically, the non-competition clause provided, in relevant part:

> **Section 7.1(a).  Non-Competition.**  In connection with the purchase and sale of the Shares and the cancellation of the Options, the payments provided for herein and the mutual covenants provided for herein, during the period beginning on the Closing Date and ending on the fifth anniversary of the Closing Date (the "Restricted Period"), each Restricted Seller shall not, and shall not allow any of their respective Affiliates to, engage (whether as an owner, operator, manager, employee, officer, director, consultant, advisor, representative or otherwise), directly or indirectly in the Restricted Business in the United States of America or in any other geographic area in which the Company or any of its Subsidiaries has conducted or proposed to conduct its business at any time during the two-year period prior to the Closing Date. . . .  For the purposes hereof, "Restricted Business" means the business conducted and proposed to be conducted by the Company or any of its Subsidiaries as of the Closing, which shall include the design and manufacture of medical devices used in the fields of women's and infants' health, urology and gastroenterology.

38.      Per the terms of Section 7.1(a) of the Stock Purchase Agreement, the non-competition clause remained in force (unless tolled, as described below) from December 10, 2010, through and including December 9, 2015.

*Non-Solicitation Agreement*

39.     The Stock Purchase Agreement also contained a non-solicitation clause, set forth in Section 7.1(b), pursuant to which Smith and Wallace agreed, over the course of the same five-year, post-closing period, not to, among other things, directly or indirectly, solicit or hire any person employed by CI or solicit business from any customer, end-user, client, licensor, supplier, strategic partner, or other business relation of CI, or otherwise interrupt or interfere with CI's relations with such individuals or entities.

40.     More specifically, the non-solicitation clause provided, in relevant part:

> **Section 7.1(b).   Non-Solicitation.**   In further consideration of the goodwill being purchased by the Buyer hereunder and the consideration set forth herein, each Seller . . . agrees that, during the Restricted Period, such Person shall not, and shall not permit any of such Person's Affiliates to, directly or indirectly,
>
>> (i) contact, approach or solicit for the purpose of offering employment to or hiring (whether as an employee, consultant, agent, independent contractor or otherwise) or actually hire any person employed by the Company or any of its Subsidiaries at any time during the three month period immediately prior to the Closing Date . . . .
>>
>> (ii) induce, solicit or otherwise encourage, or attempt to induce, solicit or otherwise encourage any customer, end-user, client, licensor, licensee, supplier, manufacturer, distributor, master distributor, group purchasing organization, strategic partner, or other business relation of the Company or any of its Subsidiaries (collectively, "Business Relations"), (A) to cease doing business with the Company or any of its Subsidiaries, (B) to enter into any business relationship (involving the Restricted Business) with such Person or such Person's Affiliates or any Person other than the Company, its Subsidiaries and/or its affiliates to the detriment of the Company or any of its Subsidiaries or (C) to interfere in any way with the relationship between any such customer, client or other Business Relation and the Company or any of its Subsidiaries. . . .
>>
>> (iii) engage in any business activity with any Business Relation in competition with the Company.

13

41. Like the non-competition clause, the non-solicitation clause remained in force (unless tolled) from December 10, 2010, through and including December 9, 2015.

42. In connection with the non-competition and non-solicitation clauses, the Stock Purchase Agreement also specifically provided for the right to injunctive relief in the event of a breach of Section 7.1. More specifically, Section 7.1(d) provided:

> **Section 7.1(d). Remedy for Breach.** Each Seller acknowledges and agrees that in the event of a breach by such Person of the provisions of this **Section 7.1** monetary damages shall not constitute a sufficient remedy. Consequently, in the event of any such breach, the Company, its Subsidiaries, Buyer and/or their respective successors or assigns may, in addition to other rights and remedies existing in their favor, be entitled to specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, in each case without the requirement of posting a bond or proving actual damages.

43. Further, the Stock Purchase Agreement set forth a series of acknowledgements on the part of Wallace and Smith. More specifically, in Section 7.1(e), Smith and Wallace acknowledged that, among other things:

a. the non-competition and non-solicitation clauses were "reasonably required for the protection of the Company, its Subsidiaries and the Buyer and the goodwill associated with the business of the Company and its Subsidiaries" (Section 7.1(e)(i)(A));

b. the Company has "extensive trade secrets and other confidential information with which such Seller has become familiar as a necessary component of such Seller's involvement with the Company" (Section 7.1(e)(ii));

c. the "value of the Company's . . . trade secrets and other confidential information arises from the fact that such information is not generally known in the marketplace" (Section 7.1(e)(iii));

d. "such Person will have such sufficient knowledge of Company's . . . trade secrets and other confidential information that, if such Person were to compete with Company . . . during the Restricted Period, such Person would inevitably rely (consciously or unconsciously) on such trade secrets and other Confidential Information causing irreparable harm to Company and its Subsidiaries" (Section 7.1(e)(v)); and

> e. the non-competition and non-solicitation promises were "given in consideration for the compensation contemplated to be provided hereunder . . . and without which the Company, its Subsidiaries and the Buyer would not receive the full value of the goodwill of the business acquired hereunder." (Section 7.1(e)(vii).)

44. Importantly, the parties further agreed in the Stock Purchase Agreement that, in the event of a breach of either the non-competition or non-solicitation clause, "the Restricted Period set forth therein shall be tolled until such breach or violation has been duly cured." (Section 7.1(f).)

45. Finally, and in addition to Section 7.1(d), the Stock Purchase Agreement elsewhere also provided generally that the parties agreed that they are entitled to injunctive relief to enforce the terms of the Agreement or prevent breaches of it, as follows:

> **Section 10.14. Enforcement of Agreement.** The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement was not performed in accordance with its specific terms or was otherwise breached. It is accordingly agreed that the parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they are entitled hereunder after the Closing Date.

*Confidentiality Agreement*

46. In addition to the Stock Purchase Agreement, Smith and Wallace also each entered into a Stockholders Agreement with TP Group, dated December 10, 2010 (attached hereto as Exhibit F), and amended and restated twice thereafter, on January 10, 2011 (attached hereto as Exhibit G), and November 1, 2013 (attached hereto as Exhibit H) (collectively, the "Stockholders Agreement").

47. All three versions of the Stockholders Agreement were signed by both Smith and Wallace and contain the same confidentiality provision (Section 16 thereof).

15

48.     Pursuant to Section 16(a) of the Stockholders Agreement, Smith and Wallace acknowledged that "all information, observations, and data (including trade secrets) obtained by" them ("Confidential Information") during their term of employment with CI was the property of CI.  More specifically, Confidential Information was defined in the Stockholders Agreement, in relevant part, as follows:

> **Section 16(a).  Obligation to Maintain Confidentiality.** . . . Confidential Information will be interpreted as broadly as possible to include all confidential information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is related to the Company's or its Subsidiaries' or Affiliates' current or planned business, or their predecessors' or assignors' businesses.  Confidential Information includes, without specific limitation, the confidential information, observations and data obtained by such Executive during such Executive's employment concerning the business and affairs of the Company and its Subsidiaries and Affiliates and their predecessors and assignors, information concerning acquisition opportunities in or reasonably related to the Company's or its Subsidiaries' or Affiliates' business or industry, the Persons that are current, former or prospective suppliers, customers, distributors, sales representatives, manufacturers, referral sources, end-users or independent contractors of any one or more of them, as well as development, transition and transformation plans, methodologies and methods of doing business, strategic, marketing and expansion plans, including plans or lists regarding planned and potential sales or acquisitions, financial and business plans, employee lists and telephone numbers, locations of sales representatives, new and existing programs and services, prices and terms, customer service, integration processes, requirements and costs of providing service, support and equipment.

49.     Further, in Section 16(a) of the Stockholders Agreement, Smith and Wallace each agreed that they "shall not disclose to any unauthorized person or use for any Person's account (other than the Company's or its Subsidiaries' account) such Confidential Information without the Board's prior written consent."

16

50.     And, in Section 16(d) of the Stockholders Agreement, Smith and Wallace each agreed to assign to CI the rights to any inventions or patents that either conceived or developed while working for CI.  More specifically, Section 16(d) provided, in relevant part:

> **Section 16(d).  Inventions and Patents.**  Each Executive hereby assigns to Clinical Innovations LLC, the Company's Subsidiary, right, title and interest to all patents and patent applications, all inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (in each case whether or not patentable), all copyrights and copyrightable works, all trade secrets, confidential information and know-how, and all other intellectual property rights that (i) are conceived, reduced to practice, developed or made by such Executive during the Employment Period and (ii) either (A) relate to the Company's or any of its Subsidiaries' actual or anticipated business, research and development, or existing or future products or services, or (B) are conceived, reduced to practice, developed or made using any of the equipment, supplies, facilities, assets or resources of the Company or any of its Subsidiaries (including any intellectual property rights) . . . .

51.     Further, Section 19(a) of the Stockholder Agreement set forth acknowledgements by Smith and Wallace regarding the need for the confidentiality obligations set forth in Section 16 that are substantially similar to those set forth in the Stock Purchase Agreement and outlined above in Paragraph 43.

52.     Finally, in Section 20(b) of the Stockholders Agreement, the parties agreed that a non-breaching party would be entitled to injunctive relief to stop or prevent breaches of the Agreement, and that a breach of the Agreement would "cause substantial and irreparable harm" to the non-breaching party.

### *"Corporate Opportunities" Obligation*

53.     Smith and Wallace entered one further agreement with TP Group in connection with the acquisition of CI—an Executive Stock Purchase Agreement, dated December 10, 2010 (the "Executive Stock Purchase Agreement," and collectively with the Stock Purchase Agreement and Stockholders Agreement, the "Agreements") (attached hereto as Exhibit I).

54.     Pursuant to Section 8(h) of the Executive Stock Purchase Agreement, Smith and Wallace each agreed that, during their employment with CI, they would submit all business opportunities to the company, rather than pursue such opportunities on their own.   More specifically, Section 8(h) provided, in relevant part:

> **Section 8(h).   Corporate Opportunity.**   While employed by the Company . . . each Executive shall submit to the Board all business, commercial and investment opportunities or offers presented to such Executive or of which such Executive becomes aware which relate to the business of the Company . . . or could be beneficial to the business of the Company . . . ("Corporate Opportunities").   During the Employment Period, unless approved in writing by the Board, each Executive shall not accept or pursue, directly or indirectly (including through such Executive's Affiliates), and Corporate Opportunities on such Executive's own behalf (whether directly or indirectly, including through such Executive's Affiliates).

*Defendants Redemption of Shares*

55.     The Stockholders Agreement and Executive Stock Purchase Agreement also granted Defendants the right to require CI to redeem, or "put," for cash shares of TP Group.   In 2015 and 2016, Defendants availed themselves of this right by exercising the put option, and thereby pulling hundreds of thousands of additional dollars out of CI.   Significantly, the fair market value of the put shares was based on a "go forward" valuation of CI (including projected revenue, growth, etc.), meaning that Defendants unjustly received value that they themselves had undermined through their (yet undiscovered) wrongdoing and competition with CI.

**Defendants Acted Together To Compete With Clinical Innovations, Solicit Its Employees and Business Relations, And Misappropriate Confidential Information And Trade Secrets**

56.     As stated above, Smith left employment with CI on or about September 2, 2011, but continued on as a stockholder of TP Group (even through today).   At some time thereafter (if not before), upon information and belief, Smith and Wallace—notwithstanding their non-competition and confidentiality obligations under the Agreements, and Wallace's continued

18

employment with CI—began working together to compete with, solicit business away from, and misappropriate confidential information and trade secrets from CI.

57.     Since 2011, Smith and Wallace have separately and jointly started and/or become affiliated with several companies that are competing, or developing products to compete, directly or indirectly, with CI.  Upon information and belief, such businesses also have been used by Defendants to solicit customers and employees away from CI.

58.     For example, in or about July 2013, Smith founded Serengeti Medical LLC, a Utah company.  Shortly thereafter, Smith also registered the domain name, www.serengetimedical.com.  As set forth further below, around this same time period, Smith and Wallace exchanged several emails, in which Wallace provided Smith with confidential information concerning TDOC, one of the two main catheter products manufactured and marketed by CI.

59.     Upon information and belief, Smith is also affiliated with Biomerics, a company with which Smith is working to develop catheters similar to TDOC and/or Koala, and to offer a competing source of catheter manufacturing.  Among other things, Smith and Biomerics have solicited business from the company that licenses the TDOC product to CI, and for which CI manufactures TDOC.  Upon information and belief, such solicitation has resulted in loss of manufacturing business to CI.  And, as described in more detail below, Biomerics and Smith also have solicited and subsequently hired a number of now-former CI employees.

60.     Further, Smith has sought to actively recruit current employees of CI to work with him at Biomerics.  During the recruitment of two current, key CI employees (the "Recruits"), including one that has been employed by CI since 2001, at some point in or about December 2015, Smith provided a tour of Biomerics' facilities, during which the Recruits observed that an

19

area at Biomerics had equipment and materials of the type necessary for manufacturing catheters similar to Koala and TDOC, including presses, a molding machine, a balloon-blowing machine, and a splitter (that appeared very similar to CI's splitter). The Recruits also noticed catheter products located at Biomerics' facilities. Smith also stated to one of the Recruits that Smith, among other things, was interested in developing a TDOC-style catheter that could be manufactured more quickly than CI was able to manufacture TDOC. Smith also stated to the employee that Smith had been offered a million dollars for his catheter product by a company currently engaged in business with CI.

61.     Upon information and belief, Defendants Smith and Wallace founded and/or are affiliated with Liger Medical ("Liger Medical" or "Liger"), a medical device company founded in or about November 2011. From May 2015 to January 2016, Smith was Liger's registered agent and sole manager. In January 2016, Liger's certificate of organization was amended to list Wallace as Liger's registered agent and sole manager.

62.     Upon information and belief, Liger Medical and Biomerics have worked, and are currently working, together. Documents uncovered from Wallace's CI email mailbox by Plaintiff's investigation include, among other things, schematic design drawings that displayed both the Liger Medical logo and a disclaimer that the drawings were property of Biomerics. Also located in Wallace's CI email mailbox were emails and agendas evidencing that Biomerics was ordering supplies and receiving packages from Liger, that personnel who are connected to both companies were holding meetings together, and that Smith and Wallace were actively getting advice and assistance from Biomerics regarding the development of products.

63.     Further, upon information and belief, in or about December 2015, Liger and Wallace also attempted to solicit the Recruits referenced above in Paragraph 60. In fact, a

20

December 10, 2015 Liger meeting agenda noted that Liger (including Wallace and Smith) was using materials taken from CI for use in a Liger and/or Biomerics product and that the Recruits, while still employed fulltime by CI, were utilizing their expertise for Liger's and/or Biomerics' benefit:  "It was decided in the meeting that we will not pursue a two (2) halves approach to the probe since we now have a free base from CI and [the Recruits] will help [us] make an insert. . . . Steve [Smith] investigate working with Biomerics on injection molding with CI base and Cure Medical LLC insert made by [the Recruits]."  The Recruits were not authorized by CI to provide materials or perform work for Liger and/or Biomerics.

64.     Documents uncovered by Plaintiff's investigation into Defendants' activities also provide evidence of Defendants working together to compete with, and/or solicit business from potential business partners or customers of, CI.

65.     For example, on May 29, 2013, Wallace emailed Smith concerning potential discussions with three medical device companies to "access [sic] their interest in having a company you are involved with to make urodynamic catheters[5] for them."  Wallace further stated: "It would be good to make sure they keep it confidential."

66.     Similarly, on June 13, 2014, Wallace emailed Smith a link to a medical device company's website, stating: "This looks like a group that can compete with TDOC.  You need to check them out and contact them.  Maybe they would love a new air charged catheter."  A few days later, on June 16, 2014, Wallace forwarded Smith an internal CI email chain regarding TDOC, and stated:  "You should contact [the medical device company] right away and see if they may be a sales partner for you."

---

[5]     A urodynamic catheter is a catheter that measures pressures between the bladder and the part of the body where urine exits.  TDOC is an example of an urodynamic catheter.

67.     In an August 30, 2013 email, Wallace stated to Smith that a business partner had just made a request for CI to manufacture a new pediatric catheter.  Wallace then stated: "You probably already know about it but seems pretty serious to develop that, [sic] **May want to beat them to the punch on that one.**" (emphasis added).

68.     In the midst of their competitive and soliciting activities, Wallace and Smith themselves recognized the conflict between such activities and their agreements with TP Group. For example, on August 15, 2013, and again on August 26, 2013, Wallace emailed Smith communications concerning the scope of their non-competition agreement with TP Group, stating to Smith on August 26 that the Stockholders Agreement "is certainly the document that will be pulled out and used if an issue comes up."

69.     Beyond competing with CI and soliciting its potential business partners and customers, after Smith left employment with CI (if not before), upon information and belief, Smith and Wallace also worked together to misappropriate from CI (where Wallace remained employed) confidential information, trade secrets, and corporate information about CI's relationships and agreements with customers and/or business partners.

70.     In furtherance of this plan to misappropriate CI's valuable information, Wallace sent to Smith, via email, several items of a confidential and/or proprietary nature relating to Koala and/or TDOC.  Among such communications are the following:

  a.   On June 24, 2013, Wallace sent Smith several emails containing confidential and sensitive information on the catheters manufactured and marketed by CI. *First*, Wallace emailed Smith a zip file called "ACdrawings," containing confidential drawings and schematics relating to numerous CI catheters,

including a gastroenterological catheter[6] and Koala. In that same chain, Smith informed Wallace that he would be meeting that week with the medical device company that was licensing the TDOC catheter to CI (and for whom CI had long provided manufacturing services), and the two also discussed reaching out to a tubing company used by CI. ***Second***, Wallace emailed Smith a zip file called "ACtech," which contained 46 documents containing various test results relating to the design and function of TDOC as well as photographs of most, if not all, of the machines CI uses to manufacture TDOC. ***Third***, Wallace emailed Smith a zip file with folders called "TDOC Transfer" and "TDOC-Urinary Cath" that included computer drawings of most (and perhaps all) of the machines used to manufacture TDOC. ***Fourth***, Wallace emailed Smith a non-public technical file relating to TDOC that contained significant data about TDOC, including risk analysis, testing reports, and other non-public information.

b. On July 12, 2013, Wallace forwarded to Smith a May 21, 2012 internal email from CI's then-President and CEO that summarized confidential and financially sensitive information contained in supply, license, and support service agreements owned by CI and relating to TDOC.

c. On August 30, 2013, Wallace emailed Smith confidential information regarding alterations being made to the TDOC catheter by CI during its manufacturing process, stating: "[Y]ou should know that the TDOC catheter

---

[6]     This catheter is fundamentally the same in principle as TDOC, but it has a larger balloon.

is being folded over and repackaged in to a shorter pouch that Ivan [Vetecnik] is making sort of easy automatic way to insert the catheter."

    d.  On December 28, 2015, Wallace emailed Smith documents relating to a variation of the Koala catheter,[7] including confidential information describing the procedure for the execution of design verification testing of the product.

71.    Upon information and belief, Defendants continue to this day to work together to compete with, and misappropriate confidential information and trade secrets from, CI. In fact, recently on July 11, 2016, CI received a call from the Chief Executive Officer ("CEO") of one of its significant customers and business partners. During the call, the CEO indicated that his company would be purchasing a next generation TDOC product from Smith, and further that, within the next six to 12 months, the company would be moving a portion of their TDOC manufacturing volume (currently manufactured by CI) to Smith and Biomerics.

### Vetecnik Acted As A Mole For Smith To Misappropriate Confidential Information And Trade Secrets From Clinical Innovations

72.    After leaving employment with CI, Smith also solicited and paid Ivan Vetecnik, a long-time CI engineer, to effectively serve as a mole within CI. Over the course of several years, Vetecnik—despite being a salaried employee of, and owning stock options in, CI—secretly leaked confidential information and trade secrets to Smith. Vetecnik also performed unauthorized work, at the behest of Smith, designing competitive products and designing and building machines for Smith's (and not CI's) benefit.

73.    Smith's secret arrangement with Vetecnik is well documented in communications uncovered through Plaintiff's investigation into this matter.

---

[7]    CI makes another product called Koala TOCO that uses a connector that specifically was designed to fit with the same cable that is used for Koala.

74.     For example, in a July 13, 2014 email to a third party, Vetecnik outlined his secret relationship with Smith, noting that his work for Smith needed to remain "under-the-table" because of non-competition concerns:

> So that is a part of my Saturday.  I will be able to devote the rest (after midnight) to completing two devices that I am making illicitly at work for this start-up company.  We are founding it together with one of the former owners of this company who, after they sold this one, received about 20 million and had to sign that he would not be doing any business in this field for five years.  First year is over in a flash and he wants to start doing pretty must [sic] the same, but a bit improved.  However, he needs me to do that because I am invented all these production lines here and I make them with "these hands."  So we have to meet secretly because the five year period will over only in January.  But until then, he is buying from me the equipment for his production so that he can start immediately. I don't know if I will decide to go over with him officially . . . .

75.     Later, in a November 2014 email to a third party, Vetecnik discussed the possibility of leaving CI to work for Smith's new company.  Vetecnik stated: "If anything, ***I'll work with [Smith] under the table, but that could result in a serious conflict of interest since one of his products will be very similar to the product we produce here***."  (emphasis added).  In another email a few days later, Vetecnik stated: "Steve with whom I'd like to start up a similar company is still prohibited from competing against [CI] for one more year. . . .  I planned it such that I'd only cooperate with him under the table and on the side, so that I would not forgo the pay here. . . ."

76.     Then, in an August 11, 2015 letter from Vetecnik to a third party, Vetecnik stated: "I have offer [sic] from former founder of Clinical Innovations to start with him same thing like this as a small partner.  He had 5 years non-compete agreement which expires this December. So I have to choose to be rich in future, like five years, but not be paid as much now like I am now, ***or stay here and work for him – competition of ours on part time secretly***."  (emphasis added).

77. In a December 2015 email to a third party, Vetecnik described his secret relationship with Smith, as follows: "For almost a year, I've been **preparing in secret a new company, which will basically be a direct competitor to our firm**. It was founded by a former owner and he had to wait five years after the sale, before the 'non-compete agreement' expired." (emphasis added).

78. In that same December 2015 email, Vetecnik then explained how significant a role he had played in the startup of Smith's company: "I was a key player, because I had designed 90% of those products myself, and then later I also manufactured the production lines for them with the varying complexity of automation." Vetecnik further noted that he had been receiving substantial payments from Smith for his secret work: "I'll continue making some devices for them here at nights, roughly for 40 thousand a year, before I kick the bucket." He also wrote to a third party in October 2015 that he had "built **all** the machines" that Smith would need for production, and that Smith had "paid me good money for that." (emphasis added).

79. Other documents uncovered through Plaintiff's investigation into this matter further evidence Vetecnik's work building machines for Smith and his provision of confidential information and trade secrets to Smith. For example:

    a. In or about January 2014, Vetecnik sent to Smith invoices for a catheter printer and a splitter, which is a machine used by CI to manufacture TDOC. On February 3, 2014, Vetecnik emailed to Smith highly detailed and specific confidential instructions that would permit Smith to replicate the key functionality and design that CI utilizes for building a splitter. Photographs located on Vetecnik's work computer from around this time also show a fully-built drill machine that was nearly identical to CI's machine.

b.  In a series of emails in summer 2014, Vetecnik emailed Smith information and communications relating to a catheter product that Smith was designing and building at the time, including information about welding solutions and design specifications.  In one email, dated June 26, 2014, Vetecnik offered to Smith potential welding solutions premised on a non-obvious technique used by CI that is a superior method for holding the catheter in place to facilitate the welding process and is not part of common knowledge in the industry.  In the same email, Vetecnik asked Smith: "What do you prefer?  It would be about $500 difference in the price, [the non-obvious technique] being more expensive.  I do not have any preference."  Vetecnik further informed Smith that he would bring Smith an example of a catheter part that was manufactured by a different CI employee: "Arlund doing it perfectly circular, I'll bring you one, so you can show it to your machinist."

c.  On October 17, 2014, Vetecnik emailed Smith regarding a machine that Vetecnik built for catheter production.  Vetecnik sent Smith information about the cost of the machine, and Vetecnik and Smith then secretly met in a Lowe's parking lot to hand over the machine.  In an email about a month later to a third party, Vetecnik stated that he sold Smith "about five machines for a production line."

d.  On January 9, 2015, Vetecnik emailed a third party, stating that he had "an offer from Steve Smith, who is planning to start-up a new company like this one next year."  Vetecnik further stated: "I don't know if I can leave such a place.  I guess I will have to do it under the table for him at nights.  I have made six important machines for production for him already this year."

27

e.   Upon information and belief, the machines built by Vetecnik for Smith included unique features or processes developed by CI, including (1) a unique way to split a catheter tube; (2) a special process to drill a hole in the tubing; and (3) a process using a non-obvious device to weld a balloon to a catheter.  Upon information and belief, such features or processes are not common knowledge in the industry and provide CI with manufacturing and/or competitive advantages.

**Vetecnik Is Terminated And Plaintiff's Investigation Begins**

80.   Vetecnik's secret arrangement with Smith was discovered by CI for the first time in or around June 2016.  More specifically, on June 10, 2016, a CI employee saw drawings on Vetecnik's desk relating to a machine for use in manufacturing a catheter that appeared to copy certain proprietary and specific design features of the connector part of the Koala catheter.  There was no legitimate business purpose for such drawings to be on Vetecnik's desk because he had no responsibilities at that time for designing or building any machines for any catheter product, including Koala and TDOC.

81.   The drawings on Vetecnik's desk, along with documents uncovered during Plaintiff's investigation into this matter, suggest that, upon information and belief, Smith is in the process of developing a Koala-like product that uses the design features of the Koala connector as well as design features of TDOC and the methodology developed at CI for manufacturing TDOC.  Upon information and belief, such a product, and associated manufacturing processes Smith and/or Wallace have developed, would compete with TDOC and also could jeopardize CI's role as the current manufacturer of TDOC.

82.   Other drawings found on Vetecnik's desk of a cross-section of catheter tubing, along with pieces of tubing that matched the drawings and did not belong to any CI product, also

suggest that, upon information and belief, Smith is in the process of developing a modification to the Koala catheter as well as the methodology for manufacturing it. Upon information and belief, such a modification would compete with Koala and, further, would permit a manufacturer to significantly cut labor costs while manufacturing the modified Koala.

83.     After Vetecnik's termination, parts that are normally used for the construction of equipment used in the manufacturing of catheters were delivered to Vetecnik's attention at CI. Vetecnik was not working on building any such equipment for CI. This further suggests Vetecnik was and is actively working on machines for Smith's benefit.

84.     In addition, Vetecnik's desk also contained schematics, drawings, calculations, and parts relating to the building of a balloon-blowing machine, which is a key component of manufacturing a balloon catheter product like Koala or TDOC. Further, surveillance video recorded on or about the afternoon of Friday, May 13, 2016 (and reviewed during Plaintiff's investigation) captured Vetecnik using CI equipment, materials, and resources to manufacture balloon-blowing machine parts. Vetecnik had no CI-related business purpose or job responsibility at that time that would have involved designing or building a balloon-blowing machine. CI was not in the process of building nor planning to build a balloon-blowing machine and Vetecnik had not been given any task relating to building such a machine for CI.

85.     On June 14, 2016, Vetecnik was terminated from his employment. Vetecnik signed his termination statement, which included the following statement: "Ivan has violated a signed agreement to not disclose confidential information as well as policies regarding outside employment and protection of confidential information within the employee handbook." Vetecnik signed the termination statement without disputing, either orally or in writing, the

29

contents despite being asked repeatedly and in different ways whether he had anything to dispute.

86.    Upon information and belief, Vetecnik's secret arrangement with Smith could not reasonably have been discovered by CI prior to May or June 2016, including because Vetecnik took efforts to conceal such arrangement, including by performing some of his work for Smith during evenings and nights when less staff were present at CI.

87.    Upon uncovering Vetecnik's work on unauthorized projects, Plaintiff commenced an emergency internal investigation to discover the breadth of Vetecnik's misconduct.  Through this investigation, Plaintiff uncovered for the first time the acts of Smith and Wallace, as alleged above.

88.    Among other things, Plaintiff's investigation has uncovered that Defendant Wallace is maintaining an account with Dropbox, a web-based storage service that permits an accountholder to upload, store, and transfer electronic files.[8]  As of June 2016, Wallace's Dropbox account contained more than 24,000 files.  Upon information and belief, as of January 12, 2016 (if not earlier), Wallace had a folder named "TDOC" in his Dropbox account that contained at least 166 files that, based on file name, appear to be technical and confidential documents related to TDOC.  Based on metadata from Wallace's CI computer, that TDOC folder no longer exists in Wallace's Dropbox account and computer forensic artifacts show that at least 60 of the files contained in that TDOC folder were deleted from this account on or about June 28, 2016.

---

[8]    Dropbox is a remote or "cloud"-based storage service that allows users to create a special folder on their computers, which Dropbox then synchronizes so that it appears to be the same folder (with the same contents) regardless of which computer (personal or otherwise) is used to view it. Files placed in this folder are also accessible via the Dropbox website and mobile devices. Plaintiff does not have access to Wallace's Dropbox account itself as it is a password-protected web-based account..

89. Further, from January 2013 to the present, Wallace has inserted into his CI-issued computer approximately 17 different USB devices, which are portable storage devices that can be used to transport files from one computer or device to another.

90. Plaintiff's investigation, which has been costly and time-consuming, continues, and Plaintiff anticipates that discovery into Defendants' actions will uncover further evidence of wrongdoing.

### Smith Solicited Other Current And Former Clinical Innovations Employees

91. Smith's solicitation efforts extended beyond Vetecnik to other current and former CI employees.

92. For example, at some time in or about December 2015, and with Wallace's knowledge (and in part for the benefit of Wallace and Liger), Smith took two current CI employees (referenced above as the "Recruits") who have critical roles in CI's design and manufacturing processes to a recruiting lunch. During the lunch, Smith told the Recruits that if they retired from or quit CI and started their own business, Smith and Biomerics would be able to give them business and help establish their own manufacturing facility. Further, as alleged more fully above, Smith then took the Recruits to visit and tour Smith's facilities at Biomerics.

93. Upon information and belief, at least two former employees of CI are currently working for, or affiliated with, Biomerics. Bryce Smith, the son of Steve Smith, worked for CI as an Associate Mechanical Engineer from approximately June 2011 to May 2014, but left to join Biomerics as a Design and Development Engineer, where he remains employed. Similarly, Kristian Olsen, another engineer, left CI in December 2014 and joined Biomerics. During his time at CI, which began in the early 2000s, Olsen was a main proponent of the modified Koala

catheter described in Paragraphs 82 and 97. Upon information and belief, Defendant Smith solicited Bryce Smith and/or Kristian Olsen to leave employment with CI and join Biomerics.

## Defendants' Actions Have Harmed Plaintiff

94.     As set forth above, and in breach of the provisions of the parties' various Agreements, Defendants engaged in years of secret conduct directed at undermining CI's competitive advantage, misappropriating CI's (and thus Plaintiff's) confidential information and trade secrets, interfering with CI's business relationships, and soliciting CI's employees to leave CI and join competing businesses.

95.     This conduct has harmed Plaintiff, the sole owner of CI and party to the Agreements with Defendants, in an amount to be proven at trial, but is reasonably expected to well exceed $75,000 into the millions of dollars of lost sales, intellectual property, and competitive market advantage. Plaintiff has suffered damages through, among other ways, Defendants' secret competition with CI, solicitation of CI's current and potential business partners and customers (including from the company that licenses TDOC to CI for manufacturing), theft of Plaintiff's confidential information and trade secrets, solicitation of employees from CI, and usurping of corporate opportunities from CI.

96.     Upon information and belief, and based upon Plaintiff's investigation into these matters to date, Defendants continue to engage in actions similar in type and common in purpose to those alleged above.

97.     If Defendants are permitted to continue engaging in conduct that breaches the parties' Agreements, Plaintiff stands to suffer irreparable harm, including, but not limited to, harm resulting from Defendants' work to develop products and manufacturing methodologies that compete with CI. More specifically, Defendants—with the aid of confidential information

belonging to Plaintiff and CI—are developing, have developed, or intend to develop a modified Koala catheter that could be manufactured at a significantly lower cost. Such a product would not only compete with CI's Koala catheter but, as a result of its significantly lower manufacturing costs, also would fundamentally alter the diagnostic catheter market and the price at which such products are sold. Defendants—again with the aid of confidential information belonging to Plaintiff and CI and misappropriated and provided by Vetecnik—are also developing, have developed, or intend to develop a modified TDOC catheter that incorporates features of the Koala catheter, including but not limited to design features of the Koala connector. Furthermore, utilizing the proprietary methods and techniques Vetecnik developed and learned at CI, as well as the numerous machines Vetecnik secretly built, upon information and belief, Defendants plan to manufacture catheter products to compete with CI's manufacturing business and to take market share away from CI.

98.     As set forth in detail above, the parties also agreed in the Stock Purchase Agreement and Shareholder Agreement that any breaches thereof would cause irreparable harm to the non-breaching party, and thus, the non-breaching party should be entitled to injunctive relief.

## COUNT I

### Breach of Non-Competition Agreement
### (Against All Defendants)

99.     Plaintiff realleges and incorporates by reference paragraphs 1–98 as if fully set forth herein.

100.     The Stock Purchase Agreement is a valid and enforceable contract entered into in exchange for good and valuable consideration.

101.    TP Group has fully performed every material obligation it owes to Defendants under the Stock Purchase Agreement.

102.    Defendants have breached Section 7.1(a) of the Stock Purchase Agreement by, among other things, engaging, directly or indirectly, in business that competes with CI.

103.    Section 7.1(a) of the Stock Purchase Agreement was supported by adequate consideration, is reasonable in scope and duration, and is not more extensive than is reasonable and necessary for Plaintiff to protect its legitimate business interests, including the protection of CI's goodwill.  The terms of Section 7.1(a) also survive a balancing of the equities in order to be enforceable.

104.    TP Group has been harmed as a result of Defendants' breaches of the Stock Purchase Agreement, and stands to suffer irreparable harm if Defendants are permitted to continue engaging in conduct that breaches the Stock Purchase Agreement.

105.    The Stock Purchase Agreement specifically provides for injunctive relief as a remedy in the event of a breach.

106.    The Stock Purchase Agreement also provides that, in the event of a breach or violation of the non-competition provision, the parties agreed that the non-competition period shall be tolled until such breach or violation has been duly cured.

## COUNT II

### Breach of Non-Solicitation Agreement
### (Against All Defendants)

107.    Plaintiff realleges and incorporates by reference paragraphs 1–106 as if fully set forth herein.

108.    The Stock Purchase Agreement is a valid and enforceable contract entered into in exchange for good and valuable consideration.

109.    TP Group has fully performed every material obligation it owes to Defendants under the Stock Purchase Agreement.

110.    Defendants have breached Section 7.1(b)(i) of the Stock Purchase Agreement by, among other things, directly or indirectly contacting, approaching, or soliciting for the purpose of offering employment to or hiring, or actually hiring any person employed by CI during the non-solicitation period.

111.    Defendants have breached Section 7.1(b)(ii) & (iii) of the Stock Purchase Agreement by, among other things, inducing, soliciting, or otherwise encouraging, or attempting to induce, solicit, or otherwise encourage, business partners and/or customers of CI, and by engaging in business activities with such entities in competition with CI.

112.    Section 7.1(b) of the Stock Purchase Agreement was supported by adequate consideration, is reasonable in scope and duration, and is not more extensive than is reasonable and necessary for Plaintiff to protect its legitimate business interests, including the protection of CI's goodwill.  The terms of Section 7.1(b) also survive a balancing of the equities in order to be enforceable.

113.    TP Group has been harmed as a result of Defendants' breaches of the Stock Purchase Agreement, and stands to suffer irreparable harm if Defendants are permitted to continue engaging in conduct that breaches the Stock Purchase Agreement.

114.    The Stock Purchase Agreement specifically provides for injunctive relief as a remedy in the event of a breach.

115.    The Stock Purchase Agreement also provides that, in the event of a breach or violation of the non-solicitation provision, the parties agreed that the non-solicitation period shall be tolled until such breach or violation has been duly cured.

## COUNT III

**Breach of Confidentiality Agreement
(Against All Defendants)**

116.     Plaintiff realleges and incorporates by reference paragraphs 1–115 as if fully set forth herein.

117.     The Stockholders Agreement is a valid and enforceable contract entered into in exchange for good and valuable consideration.

118.     TP Group has fully performed every material obligation it owes to Defendants under the Stockholders Agreement.

119.     Defendants have breached Section 16(a) of the Stockholders Agreement by, among other things, (a) disclosing, without consent, Plaintiff's and CI's Confidential Information to unauthorized persons, and (b) using, without consent, Plaintiff's and CI's Confidential Information for a person's account other than Plaintiff or CI.

120.     Defendants also have breached Section 16(d) of the Stockholders Agreement by, among other things, undermining CI's right, title, and interest to, among other things, all patents and patent applications, all inventions, innovations, improvements, developments, methods, designs, analyses, reports, trade secrets, confidential information, and know-how that are conceived, reduced to practice, developed, or made using any of the equipment, supplies, facilities, assets, or resources of CI.

121.     Sections 16(a) and (d) of the Stockholders Agreement were supported by adequate consideration, are reasonable in scope and duration, and are not more extensive than is reasonable and necessary for Plaintiff to protect its legitimate business interests, including the protection of CI's confidential information and trade secrets. The terms of Sections 16(a) and (d) also survive a balancing of the equities in order to be enforceable.

122. TP Group has been harmed as a result of Defendants' breaches of the Stockholders Agreement, and stands to suffer irreparable harm if Defendants are permitted to continue engaging in conduct that breaches the Stockholders Agreement.

123. The Stockholders Agreement specifically provides for injunctive relief as a remedy in the event of a breach.

## COUNT IV

### Breach of "Corporate Opportunities" Clause
### (Against Defendant Wallace)

124. Plaintiff realleges and incorporates by reference paragraphs 1–123 as if fully set forth herein.

125. The Executive Stock Purchase Agreement is a valid and enforceable contract entered into in exchange for good and valuable consideration.

126. TP Group has fully performed every material obligation it owes to Defendant Wallace under the Executive Stock Purchase Agreement.

127. Defendant Wallace has breached Section 8(h) of the Executive Stock Purchase Agreement by, among other things, (a) failing to submit to Plaintiff all business, commercial, and investment opportunities or offers presented to Defendant Wallace or of which Defendant Wallace became aware which relate to the business of CI or which could have been beneficial to the business of CI; and (b) accepting or pursuing, directly or indirectly, any Corporate Opportunities on Defendant Wallace's own behalf.

128. TP Group has been harmed as a result of Defendant Wallace's breaches of the Executive Stock Purchase Agreement.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff TP Group-CI, Inc. respectfully requests this Court to enter an order for Plaintiff and against Defendants granting Plaintiff the following relief:

(a) Enjoining Defendants Smith and Wallace, and anyone acting in concert with either Defendant, from further breaching the terms of the non-competition agreement for a time period to be extended pursuant to the parties' agreement that the non-competition period be tolled until such time breaches have been duly cured;

(b) Enjoining Defendant Smith and Wallace, and anyone acting in concert with either Defendant, from further breaching the terms of the non-solicitation agreement for a time period to be extended pursuant to the parties' agreement that the non-solicitation period be tolled until such time breaches have been duly cured;

(c) Enjoining Defendants Smith and Wallace, and anyone acting in concert with either Defendant, from further breaches of the confidentiality agreement, including by, among other things, (i) using or disclosing any of Plaintiff's or CI's confidential and proprietary information, or (ii) acquiring or attempting to acquire Plaintiff's or CI's confidential and proprietary information;

(d) Enjoining Defendants Smith and Wallace from selling, or attempting to sell, any product, material, concept, or manufacturing process or service obtained or derived, in whole or in part, as a byproduct of Defendants' various breaches of their Agreements with Plaintiff;

(e) Compelling Defendants Smith and Wallace to:

38

     i.     immediately return to Plaintiff, without retaining any copies, all information, data, files, and other property, including all patents and patent applications, inventions, innovations, improvements, developments, methods, designs, analyses, reports, trade secrets, confidential information, and know-how that were conceived, reduced to practice, developed, or made using any of the equipment, supplies, facilities, assets, or resources of Plaintiff or CI, in either Defendant's possession, custody, or control; and

     ii.    immediately return to Plaintiff, without retaining any copies, all Confidential Information in either Defendant's possession, custody, or control, which was obtained, disclosed, or used in breach of the parties' confidentiality agreement.

(f)     Awarding Plaintiff monetary damages from the breaches of the Stock Purchase Agreement, Stockholders Agreement, and Executive Purchase Agreement in an amount to be proven at trial;

(g)     Awarding Plaintiff its costs and expenses, including attorneys' fees and costs; and

(h)     Granting Plaintiff such other and further relief as the Court deems just and proper.

## **Jury Waiver**

Pursuant to the terms of the Stock Purchase Agreement and Stockholders Agreement, the parties have agreed to waive the right to a jury trial in any action, suit, or proceeding brought to resolve any dispute between or among any of the parties to such Agreements, whether arising in contract, tort, or otherwise, arising out of, connected with, related or incidental to the Agreements or the transactions contemplated therein.

Respectfully submitted,

TP GROUP-CI, INC.

Date: July 22, 2016                __/s/ Daniel D. Rubinstein_____

Daniel D. Rubinstein
William C. O'Neil
Michael A. Skokna
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of July 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record who have consented to accept service by electronic means.


 _/s/_ Michael A. Skokna_____