| | | |
|---|---|---|
| TP GROUP-CI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 7463 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| STEVEN R. SMITH AND | ) | |
| WILLIAM DEAN WALLACE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

TP Group-CI, Inc. filed this lawsuit for breach of contract against Steven Smith and W. Dean Wallace, two founders and former employees of TP Group's subsidiary Clinical Innovations.[1] In 2010, Smith and Wallace sold their ownership stakes in Clinical Innovations to TP Group. As part of the sale, Smith and Wallace agreed to several restrictive covenants that imposed non-competition, non-solicitation, and confidentiality obligations on them. TP Group alleges that, starting in mid-2013, Smith and Wallace breached those obligations by developing products in competition with Clinical Innovations, soliciting Clinical Innovations' business

---

[1]This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff TP Group is a citizen of Delaware and Illinois, as it is incorporated in Delaware and has its principal place of business in Chicago, Illinois. Defendants Smith and Wallace are both citizens of Utah. The amount-in-controversy is satisfied because it is not "legally impossible" for TP Group to recover more than $75,000 in this claim. *See Back Doctors Ltd v. Metro. Prop. and Cas. Ins. Co.*, 637 F.3d 827, 829 (7th Cir. 2011) (re-emphasizing that the amount-in-controversy requirement is satisfied unless it is "legally impossible" for the plaintiff to recover that amount).

relations and employees, and using confidential Clinical Innovations information to aid their competitive endeavors. R. 1, Compl.[2] TP Group filed this motion for preliminary injunction against Wallace,[3] seeking to enjoin him from further violating the restrictive covenants. For the reasons discussed below, the motion is granted with regard to certain activities of Wallace.

## I. Background
## A. Clinical Innovations

Clinical Innovations is a healthcare company located in Murray, Utah. R. 37-1, Pl.'s Br. at Exh. 4, McRoberts Aff. ¶ 4. Among other things, Clinical Innovations designs and manufactures pressure-sensing catheters. *Id.* It is a wholly-owned subsidiary of Plaintiff TP Group. *Id.* ¶ 3.

Plaintiff's claims revolve around two of Clinical Innovations' products, the Koala catheter and the TDOC catheter. Both products function as pressure sensors and share a similar design. R. 47-1, Pl.'s Br. at Exh. 5, Moon Aff. ¶ 6. The catheters are comprised of four primary components: (1) a piece of tubing; (2) a balloon; (3) a connector; and (4) a re-useable monitor cable. *Id.* ¶ 7. The connector is attached to one end of the tubing, the balloon to the other. *Id.* When plugged into the monitor

---

[2]Citations to the docket are indicated by "R." followed by the docket entry and, where applicable, a page or paragraph number.

[3]Although TP Group initially sought a preliminary injunction against both Defendants, it has since settled the case as to Smith, so only the claims against Wallace remain. R. 97, 9/22/16 Minute Entry.

cable, the connector pressurizes (or "charges") the air inside the tubing and inflates the balloon. *Id.* Any pressure variations in the area of the body surrounding the balloon will partially inflate or deflate the balloon, changing the air pressure inside the tubing. *Id.* The connector converts that change in air pressure into an electronic signal that is in turn read by the monitor. *Id.*

Though they share the same basic design, the Koala and TDOC differ in their application and in their role in Clinical Innovations' business. The Koala is an intrauterine catheter used to measure pressure in the amniotic sac during labor and childbirth. Moon Aff. ¶ 6. Clinical Innovations developed the Koala catheter in the mid-1990s and has marketed it ever since. McRoberts Aff. ¶¶ 11-12. It owns the intellectual property associated with the Koala catheter. *Id.* The Koala generates about ███████ per year for Clinical Innovations, representing █% of the company's total annual revenue. *Id.* ¶ 11.

The TDOC catheter has broader application, and can be used for urological and gastroenterological purposes. McRoberts Aff. ¶¶ 14, 24. Although Clinical Innovations created the TDOC catheter, the company sold its TDOC-related intellectual property rights to Laborie Medical Technologies, Corp. (a company that plays a central role in this lawsuit) in April 2014. *See id.* ¶¶ 14-17; R. 38-1, Pl.'s Br. at Exh. 4-F, TDOC Arbitration Award; R. 39-1, Pl.'s Br. at Exh. 4-H, Asset Purchase Agreement. Following the sale, Laborie retained Clinical Innovations as a non-exclusive contract manufacturer of the TDOC catheter, McRoberts Aff. ¶ 17; R. 40-

1, Pl.'s Br. at Exh. 4-J, Supply Agreement, and pays Clinical Innovations roughly ■

■ per year for its services, McRoberts Aff. ¶ 19.

### B. The Restrictive Covenants and Confidentiality Provision

Wallace founded Clinical Innovations in 1993 with co-defendant Smith and Christopher Cutler (who is not a party to this action). McRoberts Aff. ¶ 5; R. 69-1, Wallace Aff. ¶ 3. On December 10, 2010, TP Group purchased Clinical Innovations from its then-owners, including Wallace and Smith. *See* R. 1-6, Compl. at Exh. E, Stock Purchase Agreement. Under the terms of the Stock Purchase Agreement, Wallace took home ■ and Smith ■ in exchange for their respective ownership stakes. R. 34-1, Pl.'s Br. at Exh. 91. Additionally, in their capacity as Rollover Sellers, Smith and Wallace were paid a further ■ between them and granted stock in the post-acquisition entity, TP Group-CI, Inc. Stock Purchase Agreement at 11 (definition of "Rollover Sellers" and "Rollover Amount"); R. 26-8, Pl.'s Br. at Exh. 95, Schedule of Rollover Sellers.

Importantly, the Stock Purchase Agreement contained Non-Competition and Non-Solicitation Agreements (together referred to as the Restrictive Covenants) that limited Wallace's and Smith's ability to conduct business for five years after the Closing Date of the Agreement (so, from December 10, 2010 until December 9, 2015, inclusive—this Opinion will refer to this time as the Restricted Period). The Restrictive Covenants constrained not just Smith and Wallace as individuals, but also any of their "Affiliates"—defined as "any Person that directly or indirectly

4

controls, is controlled by[,] or is under common control with" Wallace or Smith. *See* Stock Purchase Agreement at 2 (definition of "Affiliates"), § 7.1(a)-(b).

Section 7.1(a), the Non-Competition Agreement, prohibited Wallace and Smith from "engag[ing] (whether as an owner, operator, manager, employee, officer, director, consultant, advisor, representative or otherwise), directly or indirectly in the Restricted Business in the United States of America … ." Stock Purchase Agreement § 7.1(a). The Agreement defined Restricted Business as "the business conducted and proposed to be conducted by [Clinical Innovations] … as of the Closing, which shall include the design and manufacture of medical devices used in the fields of women's and infants' health, urology and gastroenterology." *Id.*

Section 7.1(b), the Non-Solicitation Agreement, barred Wallace and Smith from, generally speaking, soliciting employees or customers of Clinical Innovations. Wallace and Smith promised they would not:

> directly or indirectly,
>
> (i) contact, approach or solicit for the purpose of offering employment to or hiring (whether as an employee, consultant, agent, independent contractor or otherwise) or actually hire any person employed by the Company [Clinical Innovations] or any of its Subsidiaries at any time during the three month period immediately prior to the Closing Date …
>
> (ii) induce, solicit or otherwise encourage, or attempt to induce, solicit or otherwise encourage any customer, end-user, client, licensor, licensee, supplier, manufacturer, distributor, master distributor, group purchasing organization, strategic partner, or other business relation of the Company or any of its Subsidiaries (collectively, "Business Relations"), (A) to cease doing business with the Company or any of its Subsidiaries, (B) to enter into any business relationship (involving the Restricted Business) with such Person or such Person's Affiliates or any Person other than the Company, its Subsidiaries and/or its Affiliates to the detriment of the Company of any of its

5

Subsidiaries, or (C) to interfere in any way with the relationship between any such customer, client or other Business Relation and the Company or any of its Subsidiaries (including making any negative or disparaging statements or communications regarding the Company, its Subsidiaries or its Affiliates or their respective officers, directors, employees, principals, partners, members, managers, attorney and representatives); or

(iii) engage in any business activity with any Business Relation in competition with the Company.

Stock Purchase Agreement § 7.1(b).

Wallace and Smith also agreed that, "in the event of a breach … of the [Restrictive Covenants] monetary damages shall not constitute a sufficient remedy," and TP Group would be entitled to injunctive relief. Stock Purchase Agreement § 7.1(d). The Stock Purchase Agreement further provided that the Restricted Period would be tolled "until such breach or violation has been duly cured." *Id.* § 7.1(f).

On the same day that they entered into the Stock Purchase Agreement, Wallace and Smith also executed a Stockholders Agreement as owners of the post-acquisition TP Group-CI, Inc. *See* R. 1-7, Compl. at Exh. F, Stockholders Agreement. The Agreement contained a Confidentiality Provision in which Wallace and Smith agreed to not "disclose to any unauthorized person or use for any Person's account (other than the Company's or its Subsidiary's account) such Confidential Information without the Board's prior written consent." *Id.* § 16(a). The Agreement defined Confidential Information as "all information, observations, and data (including trade secrets) obtained by" Smith and Wallace during their employment at Clinical Innovations, and stressed that the term Confidential Information should be expansively construed:

Confidential Information will be interpreted as broadly as possible to include all confidential information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is related to the Company's or its Subsidiaries' or Affiliates' current or planned business, or their predecessors' or assignors' businesses. Confidential Information includes, without specific limitation, the confidential information, observations and data obtained by such Executive during such Executive's employment concerning the business and affairs of the Company and its Subsidiaries and Affiliates and their predecessors and assignors, information concerning acquisition opportunities in or reasonably related to the Company's or its Subsidiaries' or Affiliates' business or industry, the Persons that are current, former or prospective suppliers, customers, distributors, sales representatives, manufacturers, referral sources, end-users or independent contractors of any one or more of them, as well as development, transition and transformation plans, methodologies and methods of doing business, strategic, marketing and expansion plans, including plans or lists regarding planned and potential sales or acquisitions, financial and business plans, employee lists and telephone numbers, locations of sales representatives, new and existing programs and services, prices and terms, customer service, integration processes, requirements and costs of providing service, support and equipment.

*Id.* Wallace's and Smith's confidentiality obligations also extended to Third-Party Information, defined as "confidential or proprietary information" received by Clinical Innovations from third parties and "subject to a duty on the part of the Company … to maintain the confidentiality of such information and to use it only for certain limited purposes." *Id.* § 16(b). The Agreement further prohibited the use of any Third-Party Information "except in connection with [Wallace's and Smith's] work for the Company … unless expressly authorized by a member of the Board in writing." *Id.* The Stockholders Agreement also provided for injunctive relief in the event of a breach, and stipulated that any breach would "cause substantial and irreparable harm to the non-breaching party." *Id.* § 20(b).

Unlike the Restrictive Covenants, the Confidentiality Provision in the Stockholders Agreement has no expiration date. So Wallace and Smith must abide by their confidentiality obligations indefinitely, unless the relevant information becomes public or they are required to disclose the information by law or court order. Stockholders Agreement § 16(a).

## C. Breach of the Restrictive Covenants

Although TP Group has settled the case with Smith, his conduct is still pertinent to TP Group's case against Wallace. Smith left Clinical Innovations in September 2011. R. 64-1, Smith's Resp. Br. at Exh. 1, Smith Aff. ¶ 6. Before resigning, he had served as the company's Director of Engineering. *Id.* ¶ 5. (Wallace remained as Vice President of Research and Development until he was fired in July 2016 for the alleged breaches that gave rise to this lawsuit. Wallace Aff. ¶ 15.)

After Smith resigned, he went on a mission trip to Africa for eighteen months. Smith Aff. ¶ 7. TP Group does not allege that Smith or Wallace committed any breaches while Smith was in Africa. Smith returned to Utah in March 2013. Smith Aff. ¶ 7. Not long after, TP Group alleges, Smith reentered the catheter business with gusto, developing products and soliciting business with Wallace's assistance and encouragement, and with the aid of confidential Clinical Innovations information provided by Wallace. R. 26, Pl.'s Br. at 11-12. The Complaint and Plaintiff's brief identify three of Smith and Wallace's projects that TP Group claims violated the Restrictive Covenants and Confidentiality Provision: (1) the next-generation TDOC catheter; (2) the Premo catheter; and (3) Liger Medical.

## 1. Next-Generation TDOC

In 2013, Wallace and Smith were unhappy with the status quo of the TDOC catheter. Though it had been invented by Clinical Innovations, the TDOC catheter had been marketed and distributed exclusively by a third-party company (the "TDOC Company") since its inception. McRoberts Aff. ¶ 14. But in 2011, a dispute over the distribution agreement led to an arbitration that ultimately awarded TDOC Company a full and exclusive license to the technology and know-how associated with the TDOC catheter. *See* TDOC Arbitration Award; R. 38-1, Pl.'s Br. at Exh. 4-F. Wallace in particular felt that the outcome was unjust, and wanted Clinical Innovations to develop a new next-generation TDOC catheter in response. 9/9/16 Tr. at 221:23-222:10. Wallace was disappointed when the Clinical Innovations leadership decided not to do so. *Id.* at 269:06-10.

But Smith was interested in the project. When he returned from his mission, Smith told Wallace of his desire to create a next-generation TDOC catheter. Smith Aff. ¶ 12; Wallace Aff. ¶ 17. Wallace directed Smith towards potential development partners, suggesting in an email that Smith call MMS, Mediwatch, and Laborie to "access [sic] their interest in having a company you are involved with to make urodynamic catheters for them." R. 40-1, Pl.'s Br. at Exh. 4-M. Smith reached out to Mediwatch and Laborie.[4] *Id.*

---

[4]At various places in the record, Smith both denies and admits that he solicited MMS, Mediwatch, and/or Laborie as TP Group alleges. In his affidavit and at the

Smith's contact with Laborie quickly bore fruit and a meeting was set for June 26, 2013 at the Toronto office of Audax Management, Laborie's parent company. Smith Aff. ¶ 14. Two days before the meeting, Wallace e-mailed Smith more than 800 pages of Clinical Innovations documents concerning the TDOC catheter. 9/7/16 Tr. at 169:21-170:3. The documents contained information regarding TDOC risk analyses, manufacturing methods, test reports, labeling and instructions for use, sterilization, and validation, as well as photographs of the machines used to manufacture the catheter.[5] *Id.* at 172:07-24.

At the meeting, Smith learned that Laborie wanted to introduce a new urodynamic catheter that improved upon and would compete with the TDOC catheter. Smith Aff. ¶¶ 14-15. Smith and Laborie executives discussed working together to develop a next-generation TDOC catheter and expand Laborie's line of gastroenterological products. *Id.* In a follow-up email, Laborie emphasized that its

---

preliminary injunction hearing, Smith claimed that he "made no effort to reach out to" any of the three companies, but that Mediwatch and Laborie coincidentally contacted him shortly after Wallace's email. Smith Aff. ¶ 70; R. 83, 9/7/16 Tr. at 153:03-22. But his contemporaneous response to Wallace's email shows that he did in fact solicit Mediwatch and Laborie, Pl.'s Br. at Exh. 4-M ("so far I have only left messages for Rob Laborie and Mediwatch contact"), and Smith admitted to the solicitation at a different point during his hearing testimony, 9/7/16 Tr. at 168:15-17 ("I solicited those three companies, or I met with them, depending on which company we're talking about."). Based on the current record (which might develop further as discovery progresses), Smith's contemporaneous account establishes that he did make initial contact with the three companies at Wallace's suggestion. The contemporaneous email impairs Smith's credibility, though again it is worth noting that discovery (including of non-parties) has barely begun.

[5]Smith maintains that he did not receive the files until after the June 26 meeting due to their large size, and that he deleted them without opening or unzipping the files. 9/7/16 Tr. at 170:09-15, 173:04-12. TP Group contends otherwise. Resolving this dispute is unnecessary for the purpose of ruling on the motion against Wallace.

goal was to "successfully launch a new product and replace TDoc in the market." R. 31-1, Pl.'s Br. at Exh. 68 at DW_0000075. Smith forwarded this email to Wallace, who responded, "Great, let[']s get moving. Let me know when you want to talk." *Id.* Smith met with Laborie again in July and August 2013. Smith Aff. ¶¶ 20, 22. At the August meeting, Laborie asked Smith to build a proof-of-concept for the next-generation TDOC, and Smith agreed. *Id.* ¶ 22.

Smith worked on the proof-of-concept for several months. The process was not limited to designing and building the catheter itself; Smith also had to fabricate the machines needed to manufacture the catheter. *See* Smith Aff. ¶ 24. To that end, he recruited Mike Criddle, an engineer who worked for Wallace's company, Liger Medical, to help construct a ████████████ machine. *Id.* Smith also purchased a number of custom-built fixtures from Ivan Vetecnik, a Clinical Innovations employee whom Smith had initially approached at Wallace's suggestion. *See* R. 49-1, Pl.'s Br. at Exhs. 5-S, 5-T. 5-U, 5-W, 5-X; Smith Aff. ¶¶ 16, 27, 31; R. 65, Smith's Resp. Br. at Exh. 1-A. Smith paid Vetecnik a total of $23,983 for the fixtures. *See* Smith's Resp. Br. at Exh. 1-A. By February 2014, Smith had created a prototype catheter that was capable of measuring pressure. Smith Aff. ¶ 25. Despite spending six months and thousands of dollars on the project, Smith claims he never showed Laborie the 2014 prototype and never completed the proof-of-concept. 9/7/16 Tr. at 166:20-167:13.

In April 2014, Laborie acquired TDOC Company (which, remember, had been awarded a full and exclusive license to TDOC technology by an arbitration panel in

2011). McRoberts Aff. ¶ 17. In connection with the acquisition, Laborie also outright purchased the intellectual property rights to TDOC from Clinical Innovations. *Id.*; *see also* Asset Purchase Agreement. But Laborie continued to employ Clinical Innovations, just as TDOC Company, to manufacture the TDOC catheter. McRoberts Aff. ¶ 17; Supply Agreement.

But while Laborie was making moves with TDOC Company, Laborie's relationship with Smith had stagnated. Smith Aff. ¶ 30. So Smith began reaching out to manufacturing facilities, believing that he could revitalize the next-generation TDOC project by bringing Laborie a ready development and production facility. Smith Aff. ¶ 32. He decided that a company called Biomerics, which employed one of Smith's sons, would be a good fit. *Id.*

But Smith's efforts were brought to a halt when, in April 2015, he received a cease-and-desist letter from Brian Ellacott, Laborie's President and CEO. R. 31-3, Pl.'s Br. at Exh. 78. Ellacott claimed that Laborie was a "beneficiary" of the Restrictive Covenants and demanded that Smith "immediately cease development of the competing catheter [i.e., the next-generation TDOC] and any other activities constituting a breach of [Smith's] obligations under the Stock Purchase Agreement." *Id.* In reply, Smith expressed his surprise that Ellacott would make such a demand after having known of Smith's involvement with the next-generation TDOC project for over a year, but nevertheless agreed to stop development. R. 31-3, Pl.'s Br. at Exh. 79.

Only days later, another Laborie executive named Russ Lalli invited Smith to the company's facilities in Toronto. Smith Aff. ¶ 39. There, Ellacott made an about-face and asked Smith for a proposal as to a number of "key catheter projects" in urology and gastroenterology. Smith Aff. ¶ 40; R. 29-3, Pl.'s Br. at Exh. 14 at LAB00000006. When Smith expressed his concern that submitting such a proposal would constitute solicitation under the Restrictive Covenants, R. 31-3, Pl.'s Br. at Exh. 80 at LAB00000117, Ellacott assured him that, as beneficiary of the Restrictive Covenants, Laborie would "waive the restrictive covenants to the extent necessary solely to clarify that we will not deem your discussions with us regarding a potential relationship with us to constitute a breach of the restrictive covenants," *id.* at LAB00000116; *see also* Smith Aff. ¶ 40.

With *Laborie*'s assurance in hand—but without checking with TP Group for its view of the covenants—Smith re-committed himself to the project and put together the requested proposal. R. 31-1, Pl.'s Br. at Exh. 81. But Smith claims that a dispute over the degree of his involvement—Laborie would only hire him as a consultant, while Smith wanted a bigger role—caused him to abandon the Laborie project in December 2015 and refer Laborie to Biomerics for further development work. Smith Aff. ¶¶ 41-42; Pl.'s Br. at Exh. 81 at SMITH0003407. Smith also sold his entire interest in the next-generation TDOC—including intellectual property, existing prototypes, and machines and fixtures—to Biomerics, in exchange for $250,000 and a cross-license allowing Smith to use whatever intellectual property he needed to develop his other project, the Premo catheter. *See* Smith Aff. ¶ 45;

13

9/7/16 Tr. at 197:02-05. Smith also agreed to consult with Biomerics on the next-generation TDOC project. Smith Aff. ¶ 45. Biomerics and Laborie then proceeded together on the next-generation TDOC project without (at least according to Smith) Smith's involvement. *See* R. 31-3, Pl.'s Br. at Exh. 84, Development, Manufacturing Services and Supply Agreement. In addition to jointly developing the next-generation TDOC—for which Biomerics would be Laborie's exclusive supplier—Laborie and Biomerics agreed that Biomerics would take over part of the manufacturing volume for the existing TDOC catheter. *See id.* After executing the Biomerics deal, Ellacott called his counterpart at Clinical Innovations to inform him that some of Clinical Innovations' TDOC manufacturing volume would be transferred to Biomerics and signaled that Clinical Innovations' future as a TDOC manufacturer was uncertain. McRoberts Aff. ¶ 22.

### 2. Premo

The second project that TP Group alleges violated the Restrictive Covenants is the Premo catheter. The Premo is an intrauterine catheter that is marketed as a lower-cost, higher-accuracy competitor to the Koala catheter. *See* R. 30-4, Pl.'s Br. at Exh. 52 at SMITH001410, Exh. 54 at SMITH003647, Exh. 55, Exh. 56 at SMITH 004453, Exh. 57 at SMITH004441; Smith Aff. ¶ 43.

The development timeline of the Premo is in dispute. TP Group claims that Smith began working on the Premo during the Restricted Period, Pl.'s Br. at 23, while Smith maintains that he took "no significant steps … toward the development of" the Premo until December 10, 2015, Smith Aff. ¶¶ 43-44. (Wallace, for his part,

claims that he had no involvement with the Premo catheter at all and first heard of the catheter in connection with this lawsuit. *See* Wallace Aff. ¶ 24; 9/9/16 Tr. at 229:20-230:08.)

But the parties nevertheless agree that, by late December 2015, Smith had a Premo prototype ready, though it was non-functioning, Smith Aff. ¶ 50, and that, by mid-January 2016, at least three physicians had evaluated and provided feedback on that prototype, *id.*; *see also* R. 30-4, Pl.'s Br. at Exhs. 53, 54. Smith estimates that the Premo will be ready to hit the market by the end of 2016. Smith Aff. ¶ 57; 9/7/16 Tr. at 166:05-09.

### 3. Liger

The final project that TP Group complains of is Liger Medical, LLC. Wallace founded Liger in 2011 in order to develop products to screen and treat cervical cancer in the developing world. Wallace Aff. ¶ 12. At that time, he received a letter from Clinical Innovations' then-President confirming that Clinical Innovations had no interest in pursuing Liger's intended projects and relinquishing any rights associated with those projects to Wallace. R. 69-1, Wallace's Resp. Br. at Exh. 1-C. Clinical Innovations' subsequent leadership was also aware of Liger's existence and made no objections to its development of cervical-cancer-related products. *See* R. 69-1, Wallace's Resp. Br. at Exh. 1-D. TP Group does not seek to enjoin any of Liger's activities related to the cervical cancer products. R. 90-1, Pl.'s Post-Hr'g Br. at Exh. B, Proposed Order ¶ 3.

But TP Group claims that Liger exceeded its original remit and aided Smith and Biomerics in the development of the next-generation TDOC and Premo catheters. Pl.'s Br. at 12, 14. To prove its point, TP Group relies primarily on a series of invoices from Liger billing Serengeti Medical, Smith's company, for work done between December 2013 and January 2014—the period when Smith developed the next-generation TDOC prototype. *See* R. 29-4, Pl.'s Br. at Exh. 24, Liger Invoices. These invoices bear Liger's letterhead and represent the time spent by Mike Criddle, a Liger employee,[6] helping Smith build a machine used to manufacture the prototype. *See* Smith Aff. ¶¶ 24-25, 63. Aside from the invoices, TP Group does not provide any evidence linking Liger specifically to the next-generation TDOC, the Premo, or any other product that competes with the TDOC or Koala catheters.

### D. Breach of Confidentiality

In pursuing these three allegedly competitive ventures, Smith and Wallace had access to a wealth of Clinical Innovations information. From May to November 2013, Wallace sent Smith hundreds of pages of confidential documents. *See* Pl.'s Br. at 15-17. In addition to the TDOC-related documents Wallace sent before Smith's

---

[6]Wallace testified that Criddle was not an employee and merely "consulted" with Liger, which he did with several other companies. 9/9/16 Tr. at 264:11-16; *see also* Wallace's Post-Hr'g Reply at 3. But Smith's response brief refers to Criddle as a "Liger employee," Smith's Resp. Br. at 18, and Wallace himself produced an affidavit from Criddle in which he states that he is "currently employed as Electronic & Technical Specialist at Liger Medical LLC," R. 69-4, Criddle Aff. ¶ 1.

first meeting with Audax/Laborie (*see supra* Section I.C.1.), Wallace also e-mailed Smith Clinical Innovations' (a) financial and customer information, including a spreadsheet of TDOC- and Koala-related customers and sales, R. 44-1, Pl.'s Br. at Exh. 4-V, and an email from Clinical Innovations' CEO summarizing TDOC supply, license, and support services agreements, R. 44-1, Pl.'s Br. at Exh. 4-X; (b) product and manufacturing processes information, including testing data of a TDOC knock-off, R. 44-1, Pl.'s Br. at Exh. 4-T, and information about changes in TDOC packaging, R. 40-1, Pl.'s Br. at Exh 4-L; and (c) regulatory information, including a non-public technical file that aided Clinical Innovations' application to market a product in Europe, R. 44-1, Pl.'s Br. at Exh. 4-S. And in November 2013, Wallace sent Smith a copy of Clinical Innovations' just-released five-year strategic plan, *see* R. 29-6, Pl.'s Br. at Exh. 30, a document that Clinical Innovations' Vice President of Operations called the company's "playbook" on how to "manage, run, [and] grow the business over the next five years," 9/7/16 Tr. at 89:08-10. TP Group alleges that these e-mails violated the Confidentiality Provision and seeks to enjoin further breaches of the Provisions and use of any information disseminated in violation of the Provisions. *See* Proposed Order.

## II. Standard of Review

Federal courts sitting in diversity "apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). So while federal law supplies the test for the availability of a preliminary injunction, the Court applies substantive Delaware law

17

pursuant to the choice-of-law clause in the Stock Purchase Agreement, § 10.11, and the Stockholders Agreement, § 20(h). *See Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015).

"'A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Goodman v. Ill. Dep't of Fin. and Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in *Mazurek*). In assessing a motion for preliminary injunction, the Seventh Circuit applies a two-part test. *Turnell*, 796 F.3d at 662. First, the movant must make a "threshold showing that, [] absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; [] there is no adequate remedy at law; and [] he has a reasonable likelihood of success on the merits." *Id.* The Court then considers the "balance of harms"—that is, "the irreparable harm that the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted"— and finally, "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." *Id.*

### III. Analysis

TP Group seeks a preliminary injunction to redress what it characterizes as an "existential threat to [Clinical Innovations'] business." Pl.'s Br. at 1. It claims that, without injunctive relief (a) preventing Wallace from continuing or using the fruits of competitive activity initiated during the Restricted Period and (b)

extending the Restrictive Covenants against Wallace until final disposition of this case, TP Group will suffer irreparable harm. *See* Proposed Order.

## A. Likelihood of Success on the Merits

Though a preliminary injunction is "extraordinary" relief, *Goodman,* 430 F.3d at 437, the threshold for establishing one of its requirements—that of likelihood of success on the merits—is "low." *See Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011). The Supreme Court has specifically cautioned against "improperly equat[ing] 'likelihood of success' with 'success' … ." *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981)).

TP Group premises this motion on its likelihood of succeeding in its claims against Wallace for (1) breach of the Non-Competition Agreement in the Stock Purchase Agreement; (2) breach of the Non-Solicitation Agreement in the Stock Purchase Agreement; and (3) breach of the Confidentiality Provision in the Stockholders Agreement. For the reasons set forth below, the Court agrees that TP Group is likely to succeed on all three claims.

### 1. Breach of Non-Competition Agreement

Before moving into the meat of the non-competition claim, the Court must first consider whether the restriction itself is enforceable. Although neither Wallace, *see* R. 76, Wallace's Resp. Br.; R. 89, Wallace's Post-Hr'g. Br.; R. 93, Wallace's Post-Hr'g. Reply Br., nor Smith contend that the Restrictive Covenants or Confidentiality Provision are unenforceable (though Smith "reserve[es] the issue,"

19

Smith's Resp. Br. at 30), Smith submits that TP Group seeks to enforce the Non-Competition Agreement in a manner beyond the "legitimate purposes of the provision,"[7] *see* Smith's Resp. Br. at 30-31. He argues that, "when the legitimate interests of the employer that support the [restrictive] covenant change, the scope of appropriate enforcement of the contract may also change." *Id.* at 30. So when Clinical Innovations sold its TDOC-related assets to Laborie, "the purposes of the restrictive covenants vanished with respect to that business."[8] *Id.* at 32.

In support of this contention, Smith cites three cases in which Delaware courts have construed restrictive covenants narrowly so that former employees had more freedom to compete. *See id.* at 30-31 (citing *EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595 (Del. Ch. Dec. 12, 2006); *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1 (Del. Ch. 1987); *Elite Cleaning Co. v. Capel*, 2006 WL 1565161 (Del. Ch. June 2, 2006)). But this leniency depends on the context in which the covenants appear.

---

[7]Because Smith was not removed from this motion until the motion was fully briefed, *see* 9/22/16 Minute Entry, the Court will address any of Smith's arguments that apply directly to Wallace, in case Wallace meant to rely on Smith to present their jointly applicable arguments.

[8]Smith extensively argues that one of the assets sold in the sale was the right to enforce the Restricted Covenants against him (at least with respect to TDOC-related activities), and therefore that right belongs solely to Laborie. Smith's Resp. Br. at 31-32. To support this, he relies on Ellacott's assurance that, as "beneficiary" of the Restrictive Covenants, Laborie would "waive the restrictive covenants to the extent necessary solely to clarify that we will not deem [Smith's] discussions with us regarding a potential relationship with us to constitute a breach of the restrictive covenants." Pl.'s Br. at Exh. 80 at LAB00000116. Smith also points to a clause in the Asset Purchase Agreement giving Laborie the right to request that Clinical Innovations enforce the Restrictive Covenants against Smith, R. 64-2, Smith's Resp. Br. at Exh. 2-A at 10, as proof that only Laborie may enforce the Covenants against Smith, *see* Smith's Resp. Br. at 32. As these defenses do not apply to Wallace, there is no need to address them here.

Delaware courts are willing to interpret restrictive covenants more leniently when they appear in an ordinary employment contract than when they are a part of an asset sale. *See Original Vincent & Joseph, Inc. v. Shiavone*, 134 A.2d 843, 845 (Del. 1957) (affirming that Delaware "courts of equity are less prone to enforce a restriction against competition in the case of a mere employment contract than in a case where such a restriction is a part of a contract for the sale of a business (citation omitted)); *McCann Surveyors*, 611 A.2d at 5 ("[C]ovenants not to compete when contained in employment agreements, will not be mechanically or automatically specifically enforced."). By contrast, "Delaware courts more readily enforce noncompetition covenants contained in asset or stock purchase agreements … ." *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2009 WL 3161643, at *14 n.113 (Del. Ch. Sept. 30, 2009) (citing *Tristate Courier & Carriage, Inc. v. Berryman,* 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004)). And, remember, Wallace consented to his non-competition obligations in connection with the sale of Clinical Innovations to TP Group—a transaction that netted Wallace ███ █ ███—and not as part of an ordinary employment agreement with Clinical Innovations. So the Court will enforce the Restrictive Covenants as written (at least for now; as noted earlier, Wallace reserved the right to mount a fuller challenge to enforceability later in the litigation).

And even if the Court did consider any changes to Clinical Innovations' legitimate economic interests since 2010, *cf. WebMD Health Corp. v. Dale*, 2012 WL 3263582, at *7 (E.D. Pa. Aug. 10, 2012) (observing that under Delaware law, "[t]he

employer's legitimate economic interests … are judged at the time of contracting." (citation omitted)),  it is not true that Clinical Innovations no longer has, as Smith argues, "a legitimate interest [in the TDOC catheter] left to protect," *see* Smith's Resp. Br. at 32. Clinical Innovations still manufactures the TDOC catheter for Laborie. McRoberts Aff. ¶ 17; Supply Agreement. It has an interest in maintaining that manufacturing business, and Clinical Innovations alleges that the future of that business is in doubt due in part to Wallace's competitive acts. *See* Pl.'s Br. at 39. And, contrary to Wallace's and Smith's claims that the next-generation TDOC would not compete with Clinical Innovations' manufacturing business, the introduction of a new, improved TDOC catheter to the market could only eat into sales of the current model. Because Clinical Innovations earns a fixed profit per unit of the TDOC catheter, 9/7/16 Tr. at 94:14-20, it has a stake in the volume of TDOC catheters sold. It therefore has a legitimate economic interest in the development of the next-generation TDOC, regardless of whether it or Laborie owns the TDOC intellectual property rights. So, at this stage of the litigation, the Court concludes that the Non-Competition Agreement is enforceable as written against Wallace.

Having resolved this threshold question, the Court must now assess whether TP Group is likely to succeed in its non-competition claim. This inquiry splits into two parts: First, although TP Group indiscriminately lumps the Defendants together in much of its filings, the Court must determine the extent of *Wallace*'s involvement in each of the allegedly-competitive projects (the next-generation

TDOC, the Premo catheter, and Liger Medical). Second, the Court must decide whether those projects breached the Non-Competition Agreement.

There is no dispute that Wallace is intimately involved with Liger. By his own admission, Wallace founded the company. Wallace Aff. ¶ 12; 9/9/16 Tr. at 227:14-228:07. And Wallace has devoted significant time to Liger projects, including the development of several hand-held instruments used to screen and treat cervical cancer. *See, e.g.,* R. 69-2, Prendiville Aff. ¶¶ 13-14; R. 69-4, Criddle Aff. ¶¶ 5-7; R. 69-6, Pickett Aff. ¶¶ 6, 9, 11. So Wallace's affiliation with Liger is clear.

Wallace's connection with the Premo project is more tenuous. Wallace claims absolutely no involvement with the development of Premo, and indeed testified that he first heard the name in connection with this lawsuit. Wallace Aff. ¶ 24; 9/9/16 Tr. at 229:20-230:08. TP Group characterizes Premo as the brainchild of both Defendants, *see* Pl.'s Br. at 23-26, but places the design and development of Premo squarely on Smith's shoulders, *see, e.g.,* Pl.'s Reply Br. at 15-18, and fails to provide any evidence specifically linking Wallace to Premo. Given the thin evidential record at this time, the Court declines to find Wallace responsible for any Premo-related activity.

With regard to the next-generation TDOC project, the record offers more to evaluate, though the parties disagree on how to interpret the evidence. Wallace maintains that, although he was aware of Smith's desire to develop a next-generation TDOC catheter and knew of Smith's relationship with Laborie, Wallace Aff. ¶ 17, he "had absolutely no part in developing any urodynamic or other

catheters that would compete with … the T-DOC," *id.* ¶ 24. Wallace emphasizes his absence from any meetings between Smith and Laborie, 9/9/16 Tr. at 226:15-21, and lack of involvement with Biomerics, 9/9/16 Tr. at 233:09-12, and unequivocally argues that he "never had any interest, ownership or participation in anything Smith did to pursue an improved urology catheter," Wallace's Post-Hr'g. Br. at 6.

But Wallace and Smith's contemporaneous email record tells a different story. In a May 2013 e-mail urging Smith to call MMS, Mediwatch, and Laborie to "access [sic] their interest in having a company you are involved with to make urodynamic catheters for them," Wallace wrote as if he and Smith were working together: "*We* would need to know their interest, catheter configuration, etc." Pl.'s Br. at Exh. 4-M (emphasis added). In the same e-mail, Wallace provided Smith with the target companies' contact details. *Id.* Pl.'s Br. Exh. 4-M (emphasis added). Following an unpromising conversation with Philip Stimson at Mediwatch, this time it was Smith who wrote as if he and Wallace had teamed up: "I think *we* need to sit down and rethink this whole project with some more information about the market and see others tip their hand. … Rather than go on, *we* should just get together and talk. I can meet you tomorrow." R. 29-2, Pl.'s Br. at Exh. 7 at DW_0000080 (emphases added). And after Smith's successful meeting with Laborie, in which Laborie expressed its desire to work together on the next-generation TDOC project, Wallace responded to the good news with, "Great, *let[']s* get moving. Let me know when you want to talk." Pl.'s Br. at Exh. 68 at DW_0000075 (emphasis added). Later conversations between the two confirm Wallace's continuing

participation as a behind-the-scenes contributor to Smith's relationship with Laborie. *See* Pl.'s Br. at Exh. 7 (7/9/13 e-mail from Smith to Wallace, informing him that Vetecnik refused to build fixtures for Smith: "That doesn't mean *we* can't produce a ██████ and welder and tube cutter on *our* own but it introduces a longer development cycle, higher costs and risk." (emphases added)); R. 31-2, Pl.'s Br. at Exh. 69 (7/27/13 e-mail from Wallace to Smith: "I would like to meet with you before I leave [out of town] on preparation for your Laborie mtg."); R. 26-8, Pl.'s Br. at Exh. 70 at Clinical0000426 (8/9/13 e-mail from Wallace to Smith: "PS let me know how things are progressing with Laborie … ."); R. 40-1, Pl.'s Br. at Exh. 4-L (8/30/13 e-mail from Wallace to Smith: "Also the configurations we do for the market may want to make sure that is the details that Laborie would want. le [sic] make sure we design the wish too next generation product into them from the start."). Wallace's and Smith's own words illustrate that Wallace *was* actively involved in planning and contributing ideas to the next-generation TDOC project, even though Smith was its public face.

So Wallace participated both in Liger's activities and the next-generation TDOC project. The next question is whether his actions constitute a breach of the Non-Competition Agreement. The Non-Competition Agreement prohibited any "direct[] or indirect[]" engagement (including as a consultant or advisor) in the Restricted Business—"the business conducted and proposed to be conducted by" Clinical Innovations as of December 10, 2010—during the Restricted Period (December 10, 2010 to December 9, 2015, inclusive). Stock Purchase Agreement

25

§ 7.1(a). The Restricted Business specifically includes "the design and manufacture of medical devices used in the fields of women's and infants' health, urology and gastroenterology." *Id.*

The development of the next-generation TDOC—a urodynamic catheter, Wallace Aff. ¶¶ 17, 20—falls within the plain language of the Non-Competition Agreement. Together, Smith and Wallace "design[ed]" a "medical device used in the field[] … of urology" and thus engaged in the Restricted Business. Their work on the project took place squarely within the Restricted Period, lasting from May 2013, when Wallace first prompted Smith to contact potential partners for the project, *see* Pl.'s Br. at Exh. 4-M, to December 2015, when Smith sold his interest in the next-generation TDOC to Biomerics, Smith Aff. ¶ 45. Indeed, depending on the relationship between Biomerics and the Defendants—which TP Group alleges is closer than the Defendants admit, and which will become clearer with the benefit of additional discovery—Smith and Wallace's involvement might continue to this day. And even if Wallace played no part in actually designing the next-generation TDOC, he still ran afoul of the Non-Competition Agreement by acting as an "advisor" to Smith and "indirectly" engaging in the Restricted Business when he aided Smith by providing him with, among other things, confidential Clinical

Innovations documents relating to the TDOC catheter,[9] *see* 9/7/16 Tr. at 169:21-170:3; *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *22-23 (Del. Ch. July 22, 2015) (holding that defendant indirectly competed with former employer when he "assist[ed] one of its competitors in the provision of relevant services" and "lent his knowledge and expertise" to a competitor).[10]

Wallace raises unconvincing defenses (Smith raised them too, before he settled). First, Wallace attempts to excuse his behavior by claiming that he only aided Smith in the hope that Smith would develop the next-generation TDOC *for* Clinical Innovations. Wallace Post-Hr'g. Br. at 12. This hope was supposedly justified because Wallace allegedly thought of Smith as part of the company—even though Smith resigned in 2011. *See id.*; *see also* Wallace's Post-Hr'g. Resp. Br. at 3; 9/9/16 Tr. at 268:22-24. Wallace claims that he "told people at [Clinical Innovations] about his desire for [Clinical Innovations] to develop a new catheter to compete with T-DOC, and [about] Smith's efforts in that regard," Wallace's Post-Hr'g. Br. at 6; *see also* 9/9/16 Tr. at 245:04-15 ("I don't remember everyone I told, but I was very open

---

[9]At the preliminary injunction hearing on September 7, 2016, Wallace urged the Court to disregard indirect competition because TP Group raised the theory for the first time in its Reply Brief. 9/7/16 Tr. at 42:25-43:17. Wallace argued that it would be improper for the Court to consider indirect competition because TP Group's failure to discuss it in its initial Brief robbed Wallace of his chance to respond. *Id.* The Court instead invited Wallace to address the indirect competition argument in his post-hearing brief, *id.* at 180:08-15, which Wallace did not do.

[10]In Delaware, unreported decisions have precedential value and may be cited. *See Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1207 (Del. Ch. 1987) (unreported decisions are "entitled to great deference," though they are not necessarily *stare decisis*).

at CI with this information."), and offers this as evidence of his belief that aiding Smith equated to aiding Clinical Innovations. But Wallace offers no evidence other than his vague testimony to back up his assertion that he told others at Clinical Innovations about Smith's pursuit of the next-generation TDOC project. On the current record, which clearly establishes that manufacturing TDOC catheters is crucial to Clinical Innovations, it makes no sense that Clinical Innovations would just shrug off learning about Smith's proposed competitive product. What's more, if Wallace really thought Smith was developing the next-generation TDOC *for* Clinical Innovations, then why did he approach product development in such an unorthodox way—working only with Smith and Laborie (a third party)—instead of taking the matter to Clinical Innovations' management? And Wallace does not explain how Smith, a non-employee and minority shareholder, could unilaterally override Clinical Innovations management's decision to *not* pursue the next-generation TDOC project, a decision that Wallace claims they had already made in 2011. *See* Wallace Aff. ¶ 11. This defense is not credible.

Wallace next asserts that he did not breach the Non-Competition Agreement because the next-generation TDOC catheter does not compete with any Clinical Innovations products. Wallace's Resp. Br. at 18. He notes that, after Clinical Innovations "lost its ownership of the T-DOC intellectual property in 2011," it decided to not develop a next-generation urodynamic catheter. *Id.* Consequently, "the emails that Wallace exchanged with Smith concerned a product that [Clinical Innovations] had already decided not to pursue." *Id.*

This argument ignores the plain language of the Non-Competition Agreement, which bars Wallace from "engag[ing] … directly or indirectly in the Restricted Business," defined as "the business conducted and proposed to be conducted by [Clinical Innovations] … as of the Closing [December 10, 2010]." *See* Stock Purchase Agreement § 7.1(a). "[T]he design … of medical devices used in the field[] … of urology" is specifically included as a type of Restricted Business. *Id*. The Agreement does *not* purport to govern only products in competition with specific, existing Clinical Innovations product lines whose associated intellectual property is also owned by Clinical Innovations. And even if the Court were to accept this narrow construction, Wallace's defense would still fail. First of all, the scope of Restricted Business encompasses "the business conducted … by [Clinical Innovations] … *as of the Closing*." *Id*. (emphasis added). It is undisputed that, at Closing (December 10, 2010), Clinical Innovations owned all the intellectual property related to the TDOC catheter. *See* TDOC Arbitration Award (awarding TDOC Company a full and exclusive license to the TDOC technology and know-how, but not until November 2011); Asset Purchase Agreement (selling all TDOC intellectual property to Laborie in April 2014). So, to the extent that ownership of intellectual property has anything to do with Clinical Innovations' rights under the Non-Competition Agreement (and the absence of such language in the Agreement suggests that it does not), Clinical Innovations would still have rights against the next-generation TDOC project. And, as discussed earlier in this Section, just because Clinical Innovations decided not to pursue the next-generation TDOC itself

does not mean that it is not a competitive product, because sales of the next-generation catheter would inevitably detract from sales of the current generation. So this defense also fails.

Last up is Liger. To tie Liger to competitive activity, TP Group alleges that Liger has "worked together with other companies" that are involved with either the next-generation TDOC or the Premo. Pl.'s Br. at 12. But the connections are vague. For example, TP Group points to one schematic design drawing—not alleged to be part of Premo or the next-generation TDOC—with both the Liger logo and the notation "property of Biomerics" as evidence that Biomerics is a Liger affiliate (or vice versa). *See* Pl.'s Br. at 14, Exh. 17. TP Group also offers three Liger meeting agendas and one Biomerics invoice to demonstrate that Smith attended Liger meetings and that Biomerics did some work for Liger. *See* Pl.'s Br. at 14; R. 26-8, Pl.'s Br. at Exhs. 18, 19; R. 29-4, Pl.'s Br. at Exhs. 20, 21. But neither the agendas nor the invoice suggest that Liger had anything to do with catheter products; rather, they only reveal that Liger was in the business of developing cervical cancer products, just as Wallace maintains.

TP Group's strongest bit of evidence tying Liger to the catheter business is a series of invoices from Liger billing Serengeti Medical, Smith's company, for hours worked between December 2013 and January 2014. *See* Liger Invoices. Recall that this is the exact time period in which Smith developed the next-generation TDOC prototype. Smith explains that Mike Criddle, a Liger employee, worked for him as an independent consultant and helped him build a machine to manufacture the

next-generation TDOC prototype. *See* Smith Aff. ¶¶ 24-25, 63. Wallace acknowledges that Criddle "did some consulting work" for Smith—but only in an individual capacity, and not as a representative of Liger. 9/9/16 Tr. at 265:06-15. When asked why Criddle billed for his work on a *Liger* invoice, Wallace responded that "you need to ask Steve Smith or Mike Criddle." *Id.* But Wallace, by his own admission, *did* ask Criddle about it, *id.* at 265:11 ("I saw this in the complaint so I asked Mike Criddle about it … ."), but Wallace gave no further explanation. Nor does he explain why Criddle's own affidavit—which Wallace provided and presumably solicited for his defense—asserts that "[t]here have been no ongoing or past projects at Liger … that are competitive with Clinical Innovations," but does not mention Criddle's work for Smith or explain the Liger Invoices, when such an explanation would have helped Wallace's defense. *See* Criddle Aff. ¶ 8. These are suspicious facts, but right now (discovery might very well change this) there is not enough evidence to find that Liger's activities breached the Non-Competition Agreement. In sum, TP Group is likely to succeed in its non-competition claim against Wallace only as to the next-generation TDOC project.

### 2. Breach of Non-Solicitation Agreement

Turning to TP Group's non-solicitation claim, in its Complaint and brief, TP Group alleges two instances that could be construed as solicitation by Wallace. In both instances, it was Smith who made the actual contact, but the question is whether Wallace can be deemed to have indirectly solicited through Smith. The first alleged solicitation is a July 2013 meeting between Smith and Vetecnik, a Clinical

Innovations engineer, where Smith offered to hire Vetecnik to help develop the next-generation TDOC. *See* Smith Aff. ¶ 16.

The Stock Purchase Agreement prohibited Wallace from "indirectly … contact[ing], approach[ing] or solicit[ing] for the purpose of offering employment to or hiring … any person employed by" Clinical Innovations "during the three month period immediately prior to the Closing Date."[11] Stock Purchase Agreement § 7.1(b)(i). The record shows that Smith contacted and approached Vetecnik[12] for the purpose of hiring him to build catheter-manufacturing fixtures. Though Smith testified that he met with Vetecnik in July 2013 because he merely "wanted to know what [Vetecnik] was doing," 9/7/16 Tr. at 101:11-20, and that it was in fact *Vetecnik* who solicited *Smith*, *id.* at 102:09-10, the Court does not find these explanations convincing. Smith's own sworn affidavit contradicts the explanations, Smith Aff. ¶ 16 ("I approached Vetecnik about [the] possibility of" using "his expertise to assist me" with the next-generation TDOC catheter), as does Smith's contemporaneous account of events, which he recorded in an e-mail to Wallace that reads:

> The other thing that happened is *Ivan called me and said that he can't work for me*. … Anyway, he said he already feels like a criminal and can't betray his friends at CI. He seemed pretty determined to bow out of this and he

---

[11] The parties do not dispute that Vetecnik, who worked at Clinical Innovations from the early 2000s until June 2016, Pl.'s Br. at 18 n.16, qualifies as such a person.

[12] Smith denies (at times) that he initiated contact. But the sequence of who contacted whom would not impact the outcome of the solicitation claim, as the Non-Solicitation Agreement bars Smith from *any* "contact … for the purpose of … hiring" a Clinical Innovations employee. *See* Stock Purchase Agreement § 7.1(b)(i).

doesn't want to retire. That doesn't mean we can't produce a ███████ and welder and tube cutter on our own but it introduces a longer development cycle, higher costs and risk.

Pl.'s Br. at Exh. 7 at DW_0000080 (emphasis added). The Court infers from this email that Smith approached Vetecnik with the purpose of hiring him, as otherwise Vetecnik would have no reason to call Smith and decline to work for him.

Having found that Smith solicited Vetecnik, the Court must assess Wallace's involvement and whether it rises to the level of indirect solicitation. Wallace protests that he has "had no role in any efforts by Smith or anyone else to convince any CI employees to leave CI and assist Smith." Wallace Aff. ¶ 27. But Smith claims it was Wallace who suggested that he contact Vetecnik. Smith Aff. ¶ 16 ("Wallace [] told me that Ivan Vetecnik … was contemplating retirement from [Clinical Innovations], and that I might be able to use his expertise to assist me."); 9/7/16 Tr. at 161:17-25. And the project that Smith sought Vetecnik's help with—the next-generation TDOC catheter—was one that Smith and Wallace were working on together, as explained earlier in this Opinion. *See supra* Section III.A.1.; Pl.'s Br. at Exh. 7 at DW_0000080 (e-mail from Smith assuring Wallace that Vetecnik's denial "doesn't mean *we* can't produce" the fixtures "on *our* own," but that it would take longer. (emphases added)). It is likely that TP Group will succeed on the merits of this solicitation claim.

The second instance of alleged solicitation is the next-generation TDOC proposal that Smith submitted to Laborie in 2015, which TP Group claims was a violation of the ban against soliciting Business Relations.[13][14] The Stock Purchase Agreement barred the Defendants from "directly or indirectly, … induc[ing], solicit[ing] or otherwise encourag[ing], or attempt[ing] to induce, solicit, or otherwise encourage" any Business Relation to (a) cease doing business with Clinical Innovations; or (b) enter into *any* business relationship with the Defendants; or otherwise interfere in any way with the relationship between Clinical Innovations and its Business Relations. Stock Purchase Agreement § 7.1(b)(ii). The Agreement also contains a catch-all that prohibited Smith and Wallace from "engag[ing] in *any* business activity with *any* Business Relation in competition with" Clinical Innovations. *Id.* § 7.1(b)(iii) (emphases added).

Remember that in May 2015, Smith traveled to Toronto to meet with Ellacott and other Laborie executives. There, they discussed working together on TDOC and

---

[13]Defined as "any customer, end-user, client, licensor, licensee, supplier, manufacturer, distributor, master distributor, group purchasing organization, strategic partner, or other business relation" of Clinical Innovations. Stock Purchase Agreement § 7.1(b)(ii).

[14]Although TP Group cites communications between Smith and Laborie from 2013 as evidence of solicitation, *see* Pl.'s Br. at 26-28, it fails to allege any form of business relationship between Laborie and Clinical Innovations prior to April 2014, when Laborie acquired TDOC Company and entered into the Supply Agreement and Asset Purchase Agreement with Clinical Innovations. So, because TP Group has not established that Laborie was a "Business Relation" before 2014, the Court does not consider any pre-April 2014 communications between Smith and Laborie as potential violations of the Non-Solicitation Agreement.

"other significant opportunities in urology and [Laborie's] growing GI business." Pl.'s Br. at Exh. 80 at LAB 00000118-9. Smith promised to submit a proposal, *id.*, which he did in June 2015, *see* Pl.'s Br. at Exhs. 81, 82. The proposal addressed gastroenterological and urological catheter development and manufacturing, including for the next-generation TDOC. *See id.*; 9/7/16 Tr. at 137:03-09 ("They were soliciting a proposal to develop the next-generation TDOC catheter and add to that several products … ."). The parties do not dispute that, at the time, Laborie was a Business Relation of Clinical Innovations. *See* Supply Agreement.

This proposal fits in the plain language of the Non-Solicitation Agreement. Smith's meetings and communications with Ellacott and other Laborie executives, and his subsequent proposal to develop and manufacture the next-generation TDOC and other catheters for them (including gastroenterological catheters) clearly constitute "business activity" with a Clinical Innovations Business Relation. *See* Stock Purchase Agreement § 7.1(b)(iii). But, as with the Vetecnik solicitation, Wallace's liability turns on whether *he* can be deemed to have "indirectly" engaged in the business activity through Smith. The answer is yes.

As explained earlier in this Opinion, Wallace was an active participant in the next-generation TDOC project. *See supra* Section III.A.1. At a minimum, he served as Smith's advisor and sounding board, and provided valuable assistance in the form of business opportunities (such as MMS, Mediwatch, and Laborie) and confidential Clinical Innovations information. *Id.* But e-mails from the project's early stages in 2013, in which Smith and Wallace discussed their plans for the next-

35

generation TDOC using terms like "us" and "our" and "we," prove that they were working together. *See, e.g.,* Pl.'s Br. at Exhs. 4-L, 4-M, 7 at DW_0000080, 68 at DW_0000075, 69, 70 at Clinical0000426. And the record suggests that Wallace stayed involved through 2014. For example, in August 2014, Wallace and Smith exchanged e-mails about Laborie's acquisition of TDOC Company and the Asset Purchase Agreement between Laborie and Clinical Innovations. *See* R. 31-3, Pl.'s Br. at Exh. 74. Responding to Smith's report that Biomerics and Laborie were working together, Wallace responded, "I'm surprised to hear Biometics [sic] involvement. Did Russ [Lalli, a Laborie executive] contact them, if so how did it happen? Russ wi[]ll poison that relationship as well. *I think we should get together and talk.* When can we meet?" *Id.* at DW_0010486 (emphasis added). And in November 2014, Wallace responded to an email from Smith titled "Sale of Laborie" with, "[W]hat is the details of the sale, what does this mean for catheter project?" R. 31-3, Pl.'s Br. at Exh. 76. Though more thorough post-discovery record might yield a different factual picture, at this juncture, TP Group had adequately shown that Wallace was Smith's partner in the next-generation TDOC project. Therefore, the Court finds that Wallace indirectly engaged in business activity with a Business Relation when Smith submitted his proposal for the next-generation TDOC project to Laborie and TP Group is likely to prevail on its non-solicitation claim against Wallace.

### 3. Breach of Confidentiality Agreement

The final claim is for breach of confidentiality. The Stockholders Agreement treats the term Confidential Information "broadly," defining it as "all information, observations, and data (including trade secrets) obtained by" Wallace during his employment at Clinical Innovations—"whether merely remembered or embodied in a tangible or intangible form"—"that is related to" Clinical Innovations' "current or planned business." Stockholders Agreement § 16(a). Wallace agreed to not disclose Confidential Information "to any unauthorized person or use [the Information] for any Person's account … without the Board's prior written consent." *Id.*

It is undisputed that, from May to November 2013, Wallace sent Smith hundreds of pages of Clinical Innovations documents. *See* Pl.'s Br. at 15-17; 9/9/16 Tr. at 246:17-19 (Q: "You'd agree with me that you sent [Smith] 800 pages of CI documents, correct?" A: "Yes."). These documents included financial and customer information, product and manufacturing processes information (including schematics and test results), regulatory information, and Clinical Innovations' five-year strategic plan. *See* Pl.'s Br. at Exhs. 4-L, 4-S, 4-T, 4-V, 4-X, 30; 9/7/16 Tr. at 169:21-170:3 (Smith acknowledging that Wallace sent him more than 800 pages of documents relating to the TDOC catheter two days before his meeting with Laborie about the next-generation TDOC project). (A more comprehensive accounting of Wallace's transmissions can be found in the Background section of this Opinion. *See supra* Section I.D.).

Wallace contends that, despite sending these documents to Smith, he did not breach the Confidentiality Provision. First, he claims that the documents are not confidential because there "are not marked as confidential and many of them are not even marked as being owned by" Clinical Innovations. Wallace Aff. ¶ 17; Wallace's Resp. Br. at 20-21. Wallace points to the fact that "everyone with … access to the company internet" could access the "product and processes information … [and] regulatory information" as evidence that these documents did not constitute Confidential Information. Wallace Aff. ¶ 19; Wallace's Resp. Br. at 21. But the Confidentiality Provision does not require that Confidential Information be marked as such. *See* Stockholders Agreement § 16(a). In fact, it specifically notes that the term Confidential Information "will be interpreted as broadly as possible" and includes information that is "merely remembered" (and therefore impossible to "mark" as confidential). *Id.* And although the Provision exempts information that is or becomes "generally available … to the public," *see id.*, the fact that some of the documents at issue could be accessed by other Clinical Innovations employees on the company internet does not render those documents publicly available. Wallace disclosed Confidential Information.

Wallace next argues that his June 24, 2013 e-mail (sending Smith 800+ pages of TDOC-related documents) is not in breach of the Confidentiality Provision because he only sent the e-mail so that Smith could ensure that his development of the next-generation TDOC "would not use any of the old T-DOC IP." Wallace Aff. ¶ 17; 9/9/16 Tr. at 225:11-15. But this contradicts a different Wallace defense, namely

38

that his actions were harmless because Smith already knew the information in the documents transmitted. *See* Wallace's Post-Hr'g. Br. at 10 ("Smith had no need to review any of the documents Wallace sent because Smith designed the T-DOC catheter, [and] knew everything about the old version … ."). And in any case, Wallace's intentions are irrelevant; what matters is whether his *actions* constituted breach. *See Kan-Di-Ki*, 2015 WL 4503210, at *26 ("In analyzing a plaintiff's claim for breach of contract under Delaware law … the Court generally does not inquire into the defendant's state of mind."). As for the argument that Smith already knew the information contained in the transmitted documents, such a claim might—if true[15]—affect a calculation of damages, but does nothing to counter the fact that the transmission itself violated the Confidentiality Provision. (The focus on the transmission itself is also the reason why another Wallace defense—that Smith did not receive some of the documents and did not open or use the others, Wallace's Post-Hr'g. Br. at 10-11—is rejected.)

Wallace also posits that, "[a]lthough [h]e and Smith did exchange information about CI from time to time, there was nothing improper" about it because Smith

---

[15]It is implausible that Smith would remember all, or even a substantial portion, of the information in the June 24 documents—which include photographs of manufacturing machines, information pertaining to risk analyses, manufacturing methods, test reports, labeling and instructions for use, sterilization, and validation. *See* 9/7/16 Tr. at 171:18-172:24.

still owned TP Group or Clinical Innovations stock.[16] Wallace's Resp. Br. at 22. Wallace argues that "[n]othing in any of the agreements cited by [TP Group] would prohibit two owners of the company from discussing information about the products, finances or operations of the company." *Id.* The only legal authority that Wallace cites to support this contention is Delaware Code § 220, which governs a stockholder's right to inspect the books and records of a Delaware corporation. *See* Wallace's Post-Hr'g. Br. at 10; 8 Del.C. § 220. But § 220 is of no help to Wallace. First, as a prerequisite to exercising his § 220 inspection rights, a stockholder must make a "written demand under oath stating the purpose" of the inspection, 8 Del.C. § 220(b), which Smith did not do. Second—and not surprisingly—the inspection rights are limited to "[t]he corporation's stock ledger, a list of its shareholders, and its books and records," and, in some cases, a "subsidiary's books and records." *Id.* § 220(b)(1) and (2). The scope of the documents sent to Smith far exceeds these bounds. Finally, a stockholder may only use § 220 to inspect for a "proper purpose," meaning "a purpose reasonably related to such person's interest as a stockholder." *Id.* § 220(b). Wallace provides no explanation of how Smith's receipt of Confidential Information related to his interests as a stockholder of TP Group/Clinical Innovations. So § 220 cannot justify Wallace's actions.

---

[16]TP Group does not dispute that Smith remained a stockholder during the relevant period. *See* Pl.'s Reply Br. at 12 n.12.

The last Wallace defense that bears addressing is his contention that, because Clinical Innovations no longer owns the rights to the TDOC line, "[a]ny claim of confidentiality over [TDOC-related] documents is manufactured by CI now solely for the purpose of the unjust lawsuit against … Wallace." Wallace's Resp. Br. at 22. Wallace does not refer to any sources—whether in the Stockholders Agreement, Delaware law, or elsewhere—that suggest a company may only contractually protect the confidentiality of information that it legally owns, and cannot protect confidential information that is provided to it by others. What's more, the Confidentiality Provision specifically extends Wallace's obligations to information that Clinical Innovations does *not* own. *See* Stockholders Agreement § 16(b) ("Each Executive understands that the Company … will receive from third parties confidential or proprietary information ("Third-Party Information") … . [E]ach Executive will hold Third-Party Information in the strictest confidence and will not disclose to anyone … ."). Third-Party Information—which Wallace is bound to keep confidential—includes all "confidential or proprietary information" received from third parties that is "subject to a duty on the part of [Clinical Innovations] … to maintain the confidentiality of such information and to use it only for certain limited purposes." *Id.* Assuming, for the sake of argument, that TDOC-related documents fall outside the definition of Confidential Information, they remain covered under the Confidentiality Provision as Third-Party Information, because Clinical Innovations had an obligation under the Asset Purchase Agreement to "maintain the confidentiality of such information." *See* Asset Purchase Agreement

§§ 3.4 (Seller Clinical Innovations promises to hold as confidential all Confidential Information), 7.1 (defining "Confidential Information" to include all confidential and proprietary information related to the Business), Recitals (defining Business to include, among other things, the development and manufacturing of urodynamic catheters). For these reasons, the Court finds that TP Group is likely to succeed in its breach of confidentiality claim against Wallace. Thus, with the exception of the non-competition claims relating to Premo and Liger, TP Group has demonstrated its likelihood of success on the merits of all its claims.

## B. Irreparable Harm and No Adequate Remedy at Law

Before it can move on to part two of the preliminary injunction inquiry, TP Group must also establish that, "absent preliminary injunctive relief, [it] will suffer irreparable harm in the interim prior to a final resolution" and that "there is no adequate remedy at law." *See Turnell*, 796 F.3d at 662.

It is a settled principle of Delaware law that, in a breach of contract claim, "contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing … injunctive relief." *AM Gen. Holdings LLC v. The Renco Grp.,* 2016 WL 787929, at *2 (Del. Ch. Feb. 19, 2016); *see also, e.g., Gildor v. Optical Solutions, Inc.,* 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) ("[A]s long as the parties did not include the irreparable harm stipulation as a sham … then the stipulation will be upheld."); *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *3 (Del. Ch. Jan. 17, 2007); *Newell Rubbermaid, Inc. v. Storm*, 2014 WL

1266827, at *11 (Del. Ch. Mar. 27, 2014). Both the Stock Purchase Agreement and the Stockholders Agreement stipulate that, in the event of a breach of the Restrictive Covenants or Confidentiality Provision (respectively), TP Group will suffer irreparable harm unless it receives an injunction because monetary damages will be inadequate. *See* Stock Purchase Agreement § 7.1(d); Stockholders Agreement § 20(b); *see also Martin Marietta Materials,* 68 A.3d at 1226 (regarding contractual language that "money damages would not be [a] sufficient remedy for any breach" as a "stipulation to irreparable injury").

And this particular type of breach of contract claim—for violation of non-competition, non-solicitation and confidentiality provisions—is precisely the sort of claim that cannot be adequately compensated through monetary damages. *Hough Assocs.*, 2007 WL 148751, at *3 (noting that, in non-competition claims, "after-the-fact attempts to quantify the damages from breaches of this kind involve costly exercises in imprecision"). Here, measuring the effects of Wallace's breaches would likely involve a "costly process of educated guesswork with no real pretense of accuracy." *See id.,* at *18. Although Clinical Innovations' Vice President of Operations has acknowledged that "[m]ost likely" it would be able to determine the profit lost by Laborie's decision to move its TDOC manufacturing to Biomerics, that is only one piece of the overall harm. Determining the scope of losses resulting from Wallace's competitive actions and dissemination of Confidential Information would be difficult indeed. This is because "[h]ow much business [Clinical Innovations] would have maintained or gained since [the defendant] left is unknown, ... damages

43

are difficult or impossible to compute" and, aside from an injunction, "no other adequate remedy is available." *See FBK Partners, Inc. v. Thomas*, 2010 WL 4867638, at *8 (E.D. Ky. Nov. 23, 2010) (citing *Singh v. Batta Envtl. Assocs., Inc.*, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003)) (applying Delaware law).

Wallace claims that there is no reason for injunctive relief because all breaches are in the past, and TP Group has failed to cite any cases enjoining defendants "based on past conduct that had already caused harm." Wallace's Post-Hr'g. Br. at 13 n.2. But that is not right. TP Group relies on *Hough Associates* to refute Wallace's claim that an injunction "is not applicable to things that have already occurred." *See* Pl.'s Reply Br. at 27-28 (quoting Wallace's Resp. Br. at 22). Far from "deal[ing] with ongoing conduct of the defendant," as Wallace contends, Wallace's Post-Hr'g. Br. at 13 n.2, *Hough Associates* hinged on the defendant's past actions, *see* 2007 WL 148751. There, the court granted the plaintiff's motion for preliminary injunction in a non-competition claim even though the defendant had already resigned from the competing firm and taken a new job in an unrelated field. *Id.* at *11. Not surprisingly, if a defendant's past actions violate a restrictive covenant, then often it is reasonable to believe that the defendant will violate the covenant again, especially where the evidence shows that a defendant (like Wallace) was well aware of his obligations. So it is plainly within this Court's authority to grant TP Group a preliminary injunction based on Wallace's past breaches.

What's more, it is far from certain that all breaches *are* in the past. The Court has found, based on the current record, that Wallace likely participated in the

next-generation TDOC project over the course of months, and perhaps years. *See supra* Section III.A. Wallace wants the Court to find that "there is no basis to assume or fear that Wallace is now doing or threatening to do anything that would violate any agreements with" Clinical Innovations and that any injunctive relief would be "moot." Wallace's Post-Hr'g. Br. at 14. But this essentially asks TP Group to take Wallace at his word when he claims that he voluntarily stopped working on the next-generation TDOC project and is no longer breaching his contractual obligations. It is not reasonable to force TP Group to accept that assurance in light of the prior breaches. All in all, Wallace is a sophisticated executive, who willingly entered into two agreements that provided for injunctive relief in the event of a breach. He received substantial consideration—to the tune of millions of dollars—in exchange. TP Group should get the benefit of that bargain. The Court holds that TP Group has shown that it will suffer irreparable harm if denied a preliminary injunction and has no adequate remedy at law.

### C. The Balance of Harms

Because TP Group has successfully made a threshold showing of part one of the preliminary injunction test, the Court moves on to assess the balance of the harms. Again, this inquiry considers "the irreparable harm that the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *Turnell*, 796 F.3d at 662. The balance of harms is weighed on a sliding scale against the movant's likelihood

of success; the more likely the movant is to succeed, the less he needs to show that his potential harm outweighs that of the non-movant. *Id.*

For his part, Wallace stresses the importance of his work with Liger, calling it the "culmination of his professional efforts." Wallace's Resp. Br. at 24. He states that "[a]ny delay or frustration of those efforts will cause him personal hardship, loss of income, and damage to his reputation," but does not address what those harms specifically entail. *See id.* In any event, the Court does not find—at this stage, at least—that Liger's activities have implicated the Restrictive Covenants or Confidentiality Provision, *see* Section III.A., so any preliminary injunction would not halt Wallace's involvement with Liger so long as Liger avoids breaching the agreements. And TP Group has assured the Court that it has no intention of enjoining Liger from pursuing its stated purpose of developing and manufacturing cervical cancer products. *See* Pl.'s Reply Br. at 14 n.17; Proposed Order. So, to the extent that Wallace claims that an injunction would cause him harm because of its effects on Liger's activities, that harm will not arise.

Nor does the Court find that Wallace is likely to suffer irreparable harm as a result of his inability to compete with Clinical Innovations or solicit business in the catheter industry. In March 2016—before Clinical Innovations discovered any breach—Wallace went part-time on his own accord, reducing his hours to one-fifth time. Wallace Aff. ¶ 15. This shows that Wallace had already voluntarily decided to decrease his workload and, by extension, his compensation. And even if he were to suffer a loss of income, he has not shown that he is in financial dire straits, nor

would the harm that he might suffer outweigh the harms to TP Group on the equitable scale.

### D. Public Interest

The final consideration is the public interest. The Supreme Court has directed courts of equity to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). At the same time, the Seventh Circuit has cautioned that although "[t]he public interest is one factor courts must consider in weighing the equities[,] it is not dispositive." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 n.3 (7th Cir. 1992).

Wallace asks us to pay particular attention to this factor because of the importance of Liger's potential contributions to the fight against cervical cancer. Wallace's Resp. Br. at 24-25; Wallace's Post-Hr'g Br. at 14. Of course fighting cervical cancer is a serious concern, and the possible impediment of devices to screen and combat cervical cancer very much implicates the public interest. But as the Court explained earlier in this Opinion, Liger's business will not be enjoined so long as it does not violate the agreements, *see supra* Section III.A., nor has TP Group asked the Court to enjoin the cervical cancer product development, *see* Proposed Order.

Smith puts forth (in passing) a different public-interest argument that also applies to Wallace. Smith argues that the injunction should be denied because "[t]he

public interest favors innovation and competition." Smith's Resp. Br. at 35. That is true, but Smith does not explain why innovation and competition would be better served by denying the injunction. One of the strongest incentives to innovate is the ability to profit off of one's innovations. And one of the most common ways to profit is through acquisition by another entity (this has the added benefit of encouraging useful innovations to flow toward their highest-value user). The assurance that restrictive covenants will be strictly enforced acts as a strong ex-ante incentive for these acquisitions because such covenants help ensure that the value of the innovation will not immediately dissipate as a result of competition from its original creator. So, though Smith is right to point out the importance of innovation and competition, that does not override all of the other considerations that warrant the preliminary injunction against Wallace.

# IV. Conclusion

For the reasons stated above, TP Group's motion for preliminary injunction is granted as to Wallace. Wallace is enjoined from competing against Clinical Innovations and soliciting Clinical Innovations employees and Business Relations in accordance with the terms of the Restrictive Covenants. Wallace is also enjoined from further violating the Confidentiality Provision. Nor may Wallace benefit from any prior violation of the restrictive Covenants and Confidentiality Provision.

Specifically, Wallace and any persons who act in active concert or participation with him after receiving actual notice of this preliminary injunction, are enjoined until a final judgment is entered this case, from:

1.      **Confidential Information.** Disclosing or using in any manner any confidential information, including confidential data, files, and other property, belonging to Clinical Innovations or to a third-party obtained by Wallace through his employment with Clinical Innovations. Furthermore, Wallace shall not use any information or property, including patents, inventions, designs, analyses, trade secrets, and know-how that were conceived, reduced to practice, developed or made using any of the confidential information, equipment, supplies, facilities, assets, or resources of Clinical Innovations, including using such information or property in the designing, developing, manufacturing, or marketing of medical devices used in the fields of women's and infants' health, urology, and gastroenterology, including intrauterine catheters and any version of any of the TDOC catheters.

2.      **Non-competition.** Except for the limited exception set forth below, breaching the terms of the non-competition agreement, including by engaging, directly or indirectly, in the Restricted Business in the United States or in any other area in which Clinical Innovations or its subsidiaries have conducted or proposed to conduct its business at any time during the two-year period before December 10, 2010. "Restricted Business" means the business conducted and proposed to be conducted by Clinical Innovations or its subsidiaries as of December 2010, including the design and manufacture of medical devices used in the fields of women's and infants' health, urology, and gastroenterology. This restriction requires that Wallace cease the design, development (including any clinical trials or the seeking

49

of regulatory approvals), manufacturing, and marketing of medical devices used in the fields of women's and infants' health, urology, and gastroenterology, including any intrauterine catheters and any version of any of the TDOC catheters. Provided, however, that Wallace, and his affiliated company Liger Medical, shall be permitted to design, develop, manufacture, and market medical devices specifically directed towards the diagnosis or treatment of cervical cancer.

3.     **Non-solicitation.** Except for the limited exception set forth below, breaching the terms of the non-solicitation agreement, including by, directly or indirectly:

i. contacting, approaching, or soliciting for the purpose of offering employment to or hiring (whether as an employee, consultant, agent, independent contractor, or otherwise) or actually hiring any person employed by Clinical Innovations or any of its subsidiaries at any time during the three month period immediately before December 10, 2010;

ii. inducing, soliciting, or otherwise encouraging, or attempting to induce, solicit, or otherwise encourage any customer, end-user, client, licensor, licensee, supplier, manufacturer, distributor, master distributor, group purchasing organization, strategic partner, or other business relation of Clinical Innovations or any of its subsidiaries (collectively, "Business Relations"): (A) to cease doing business with CI or any of its subsidiaries; (B) to enter into any business relationship (involving the Restricted Business) with such person or such person's affiliates other than Clinical Innovations and its subsidiaries to the detriment of Clinical Innovations or its subsidiaries; or (C) to interfere in any way with the relationship between any Business Relations and Clinical Innovations or any of its subsidiaries; or

iii. engaging in any business activity with any Business Relations in competition with Clinical Innovations.

Among other things, Wallace must cease soliciting (whether directly or indirectly) business from, or conducting or engaging in any business activity with, the Business Relations of Clinical Innovations, including but not limited to Laborie Medical Technologies Corporation.

Provided, however, that Wallace and his affiliated company Liger Medical, shall be permitted to design, develop, manufacture, and market medical devices specifically directed towards the diagnosis or treatment of cervical cancer, without regard to any of the limitations set forth above.

4. altering, destroying, or deleting any documents, devices, equipment and materials that may be relevant to the pending litigation.

Under the agreements, the Court must toll the five-year Restricted Period for any period when Wallace was in violation of the Restricted Covenants. Because TP Group has not alleged that any breaches occurred prior to May 2013, the Court will extend the Restrictive Covenants for 31 months past the initial Restricted Period (which ended on December 9, 2015) or until final disposition of this case, if earlier.

For now, the Court will issue this Opinion under seal in order to allow both parties to explain why any part of the Opinion should remain under seal. The Opinion will be provided only to the parties and their counsel at this time. Any party wishing to maintain all or part of the Opinion under seal shall file a Position Paper requesting that relief, and explaining why, by October 20, 2016. The sealing does not apply to pages 49 through 51 of this Opinion, so that the parties may disclose the preliminary injunction to non-parties.

ENTERED:


‎        s/Edmond E. Chang        
Honorable Edmond E. Chang
United States District Judge


DATE: October 12, 2016